No. 84,640

STATE OF KANSAS, *Appellee*, v. CHARLES H. ROBERSON,
*Appellant.*
(38 P.3d 715)

Opin-
ion filed January 25, 2002.

*Steven R. Zinn*, deputy appellate defender, argued the cause, and *Reid T. Nelson*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with him on the brief for appellant.

*Terra D. Morehead,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Charles Roberson was convicted by a jury of first-degree premeditated murder, aggravated robbery, aggravated battery, and forgery. He was sentenced to the hard 40 with 141 additional months to run consecutively. He appeals his murder conviction and hard 40 sentence. Roberson does not contest his convictions for aggravated robbery, aggravated battery, and forgery.

The issues are whether: (1) the trial court erred in failing to provide the jury with a verdict form that allowed the jury to find defendant not guilty of premeditated first-degree murder due to mental disease or defect and in failing to instruct the jury on the effect of a verdict of not guilty of first-degree murder due to mental disease or defect; (2) the State is required to give notice of intent to request a hard 40 sentence and, prior to sentencing, to give defendant notice of the aggravating factors on which it would rely in seeking the hard 40 sentence; (3) the trial court abused its discretion in admitting evidence of specific instances of defendant's prior conduct; (4) it was error for the trial court to instruct and the prosecutor to argue that the jury should consider lesser offenses only after concluding that defendant was not guilty of the charged offense of premeditated murder; and (5) the Kansas hard 40 sentencing scheme is unconstitutional.

Anita Wilridge died on February 21, 1999, as a result of being stabbed and cut. A stab wound to her left back was pinpointed as the actual cause of death. She had a bruise on her scalp, cuts on her face and under her chin, and a slice across the front of her neck. On her chest, there were cuts, abrasions, and a stab wound that slightly penetrated the breast bone. On her back, there was an abrasion on the lower part of the shoulder blade and a stab wound that went through the chest wall, through a rib, through a lung, and into the left ventricle of the heart. She had a large number of cuts and abrasions on her arms and hands.

Roberson has never denied killing Anita Wilridge or committing any of the other offenses he was charged with. He contends that his excessive use of crack cocaine on the day of the offenses affected the functioning of his mind.

Roberson testified that he met Wilridge when she moved into the apartment above him. Within a month, he and Wilridge were involved in a volatile sexual relationship. Roberson testified that he had used drugs his entire adult life, including cocaine, but that he had not smoked crack cocaine until he was introduced to it by one of Wilridge's friends. After that, he lost his job and apartment because all he wanted to do was use cocaine.

In mid-December 1998, Wilridge was laid off from her employment. Before Christmas she moved in with her octogenarian second cousin, Nannie Cook. Roberson continued to see Wilridge. He moved some of his possessions into Cook's basement. He stayed three nights in Cook's basement before moving into a shelter. Then he spent nights at the shelter and most days at Cook's house with Wilridge. Roberson told Cook that he had to be in the shelter by 6 p.m. and out by 8 a.m.

Sometime during the day of February 21, 1998, Roberson approached Reginald Meeks, who was walking home from the liquor store, and asked for change. Meeks refused and walked on. Roberson followed him. When Meeks turned around, Roberson pulled a knife. Meeks tried to get the knife, the two of them fought, and Roberson stabbed Meeks in the knee. Meeks wrestled the knife away, and Roberson ran away. Meeks denied having any illegal substances with him and denied that Roberson stole crack cocaine from him.

Roberson testified that he bought crack cocaine from Meeks on February 21. After smoking it, Roberson testified, he found Meeks again and tried to snatch his bag of crack; they fought, and Roberson stabbed Meeks in the leg. Roberson testified that he got away with $300 to $400 worth of crack cocaine and smoked it within an hour and a half.

Roberson also was at Cook's house sometime during the day on February 21, 1998. He left and returned between 5:30 and 6. He asked Cook to let Wilridge take him to the shelter because he was

running late. Cook did not want to loan her car to Wilridge, but Cook agreed to drive Roberson herself. Wilridge remained at Cook's house.

Once Roberson and Cook were in her car, he asked her to take him to a vacant house so he could feed his cat. Cook sat in the car for 10 to 15 minutes before Roberson got back in the car. As they drove by a convenience store, he asked her to stop so that he could call the shelter to say he was running late. After that stop, Roberson told her he wanted to take a shortcut. She went where he directed. Roberson hit the gear shift, the car stopped, and Roberson began beating Cook's head with a brown pipe. She fought back, and Roberson put something around her neck and choked her. Roberson yanked Cook's seat belt off, shoved her out of the car, and drove away. Cook's purse and dog were in the back seat of the car. She was hospitalized for several days as a result of the injuries she sustained.

Roberson testified that when he stopped supposedly to feed his cat, he smoked some crack cocaine. Roberson testified that he called the shelter from the convenience store and then had Cook take him to another vacant house where he smoked more crack. According to Roberson, when he got back in the car she asked if he was smoking crack, and he hit her with a hammer that he had gotten in the vacant house. He thought he hit her because the drug "brought out the beast" in him.

A police officer who happened to be in the area drove up behind Cook's car and saw her being beaten and then thrown from the car. Roberson drove away. Cook was covered in blood, and she stayed on the ground where she had been thrown. The officer called for medical assistance and asked that other police officers be dispatched in the direction Roberson had gone.

Roberson testified that he drove to Cook's house. When Wilridge saw him with blood all over him, she wanted to know what he had done. He went into Cook's bedroom trying to find something he could sell to buy more drugs. Wilridge came in with a knife. They argued and shoved, and Wilridge cut Roberson's hand. He got the knife and stabbed her when she turned to run. He followed, and they continued to fight. When Roberson saw a police

car pull up in front of the house, he went out the back door. Wilridge was still alive when he left. He drove to Boonville, Missouri.

At trial, the deposition of Dr. John Wisner, a psychiatrist who examined Roberson, was read. Roberson told Dr. Wisner that he had "a long history of loss of control with relatively — what appears to be minimal provocation." Dr. Wisner testified that he believed Roberson had some sort of lifelong "impulse control disorder" and was "suffering from cocaine intoxication" when he killed Wilridge. Dr. Wisner did not believe that at the time of the killing Roberson was able "to deliberate in such a fashion as to understand and take action or not take action based on an understanding of consequences." In addition, Wisner did not "believe [Roberson] would have been able to inhibit any strong drive, whether it be fear or rage or anything else, that might impel assaultive or aggressive behavior towards another person." He was unable to say whether Roberson's state was a result of mental defect or cocaine intoxication or a combination of the two. He elaborated:

"Certainly the impulse control disorder might play a role in the phase of escalating cocaine use over a period of time in a binge fashion. I would think the cocaine intoxication a sufficient cause, with or without any sort of underlying predisposition to not have very good control of impulses. In other words, possible impulse control disorder, much more certainly cocaine intoxication."

We first consider the verdict form and the court's failure to instruct the jury on the effect of a verdict of not guilty of first-degree murder due to mental disease or defect. The trial court instructed the jury on mental disease or defect with regard to the charged offense of premeditated first-degree murder. PIK Crim. 3d 54.10. The trial court also instructed the jury on voluntary intoxication as a possible defense to the charge of premeditated first-degree murder. PIK Crim. 3d 54.12-A. The verdict form permitted the jury to find defendant not guilty of premeditated first-degree murder. There was not a separate space in the verdict form for a specific finding of not guilty due to mental disease or defect. The verdict form also permitted the jury on the first-degree murder charge to find the defendant guilty of any of four lesser offenses. Defendant's trial counsel did not object to the verdict form. Nor did he request an instruction on the effect of a verdict of not guilty of first-degree

murder due to mental disease or defect or object to the court's failure to give such an instruction. See PIK Crim. 3d 54.10-A. The jury found Roberson guilty of premeditated first-degree murder.

Without a specific objection before the jury began deliberations, the giving or failing to give an instruction may not be assigned as error unless the instruction or failure to instruct is clearly erroneous. K.S.A. 2000 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001).

Here, there is almost no possibility that the jury would have rendered a different verdict if it had been instructed as appellant argues and had been given the advocated verdict form. The instruction would have stated:

"If you find the defendant not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required criminal intent, then the defendant is committed to the State Security Hospital for safe-keeping and treatment until discharged according to law." PIK Crim. 3d 54.10-A.

The argument made on appeal is that defendant was prejudiced because the jury, if properly instructed and given the proper verdict form, would have been aware that he would have been hospitalized rather than turned loose upon a determination of not guilty due to mental disease or defect. The advocated verdict form, however, would not have informed the jury that hospitalization would be the result of a not guilty by reason of mental disease or defect determination. See PIK Crim. 3d 68.06. With regard to the instruction, the unstated assumption in appellant's assertion of prejudice is that the jury believed that Roberson had a mental disease or defect defense to the murder charge but refused to give it effect for fear that doing so would put defendant back on the streets. The evidence, however, would not support a finding that Roberson murdered Wilridge solely because of his mental disease or defect. Defendant's expert witness, Dr. Wisner, testified that mental disease or defect might possibly have had something to do with Roberson's attack on Wilridge and that cocaine intoxication

certainly did. Wisner's testimony fell far short of establishing that Roberson killed Wilridge on account of his mental disease or defect. Furthermore, the jury, in spite of being instructed on mental disease or defect and voluntary intoxication, did not credit Dr. Wisner's testimony and determined that defendant was guilty of premeditated murder rather than any of the lesser offenses listed on the verdict form. We are not firmly convinced of a real possibility the jury would have rendered a different verdict with the instruction and verdict form on hospitalization.

Although not argued by the State, there is a more basic reason Roberson's argument has no merit. Roberson not only failed to object to the verdict form or the instructions, but his counsel specifically stated to the court that he was not raising an insanity defense under K.S.A. 22-3219, but rather lack of premeditation due to excessive use of crack cocaine. He did not request a jury verdict form or instruction for which he now complains was not given to the jury. At oral argument, appellate counsel argued that the State waived Roberson's failure to file the notice of intent to raise an insanity defense as required under K.S.A. 22-3219. That argument is disingenuous since Roberson never relied on an insanity defense at trial. The State cannot waive that which Roberson failed to raise at trial. In *In re Habeas Corpus Petition of Mason*, 245 Kan. 111, 775 P.2d 179 (1989), the defendant argued his actions were not premeditated due to alcoholism and blackouts. He also stated he was not relying on an insanity defense. After defendant's opening statement, the court granted a mistrial because the defendant failed to file a notice of insanity defense as required by K.S.A. 22-3219. We noted that a defendant is required to give notice of an intended defense of alibi, K.S.A. 22-3218, and mental disease or defect, K.S.A. 22-3219. We further noted that insanity and involuntary intoxication are separate defenses and that under the latter, notice is not required. In granting Mason's writ, we stated:

"To hold that evidence of a temporary mental condition caused by voluntary intoxication requires the defense to plead insanity would be to abolish the distinctions between the two defenses clearly laid out by statute and our cases. No notice of an insanity defense is required where the evidence points only to a temporary mental state negating specific intent caused by the voluntary con-

sumption of alcohol. The trial court thus erred in declaring a mistrial." 245 Kan. at 114.

At trial, Roberson did not raise an insanity defense and was not entitled to the jury verdict form or the instruction he now complains on appeal was not given to the jury.

Roberson next claims that it was necessary for the State to give notice of intent to request a hard 40 sentence and, prior to sentencing, to give defendant notice of the aggravating factors on which it would rely in seeking the hard 40 sentence.

Roberson relies on *State v. Deavers*, 252 Kan. 149, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993), in arguing that his sentence must be vacated because the State gave no notice of intent to request the hard 40. *Deavers* involved the State's failure at the time of arraignment to give notice as required by K.S.A. 1991 Supp. 21-4624 of its intent to request a separate sentencing proceeding for determining whether defendant should be required to serve a mandatory term of 40 years imprisonment. Since that time, the legislature has modified the statutory sentencing scheme for convictions of premeditated first-degree murder. Under the statute applicable to this case,

"if a defendant is convicted of the crime of capital murder and a sentence of death is not imposed, or if a defendant is convicted of murder in the first degree based upon the finding of premeditated murder, the court *shall* determine whether the defendant shall be required to serve a mandatory term of imprisonment of 40 years or sentenced as otherwise provided by law." (Emphasis added.) K.S.A. 21-4635(a).

Roberson also complains that the State failed to notify him prior to sentencing of which aggravating circumstances it would rely on. This argument stems from K.S.A. 21-4635(b). It provides that in order for the trial court to make the determination whether defendant should be required to serve a mandatory term of imprisonment of 40 years,

"the court may be presented evidence concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4636 and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, pro-

vided that the defendant is accorded a fair opportunity to rebut any hearsay statements. *Only such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing shall be admissible* and no evidence secured in violation of the constitution of the United States or of the state of Kansas shall be admissible." (Emphasis added.) K.S.A. 21-4635(b).

Roberson does not state what evidence was not made known to him prior to sentencing. The trial court based its finding that the murder was committed in an especially heinous, atrocious, and cruel manner on evidence of multiple stab wounds and that the victim was alive during and after the attack. The State contends that there was no need to notify defendant of any evidence because the evidence on which the trial court based the hard 40 sentence was adduced at trial. We agree. Evidence presented by the State at trial is made known to the defendant and is admissible for hard 40 sentencing purposes. We find no merit to Roberson's argument.

Roberson next complains of the admission into evidence of his diary and his parole status.

The diary. The gist of Roberson's complaint is that his diary excerpts, which were read aloud to the jury, were irrelevant but highly prejudicial pornographic descriptions of his sexual relations with the murder victim. Defense counsel objected to the diary being admitted into evidence. The trial court ruled that portions of the diary that addressed defendant's relationship with Wilridge, the murder victim, would be admitted. Maintaining the objection to admissibility, defense counsel worked with the prosecutor, as directed by the trial court judge, to excise irrelevant material from the portion of the diary with entries about Wilridge. The State read the edited diary excerpts aloud at trial.

The portion of the diary read to the jury showed Roberson's point of view about his relationship with Wilridge. It began when they became neighbors, developed into a sexual relationship, and within a short time became an emotional roller coaster driven by jealousy and contempt. The diary excerpts span the time between May 23, 1998, and February 24, 1999. Wilridge was murdered on February 21, 1999. In the last few diary entries, Roberson gave his account of killing Wilridge and wrote about how he felt about her after she was dead.

The State argues that the diary excerpts were admissible to show how Roberson felt toward Wilridge and, thus, show motive and intent. The State likens the diary excerpts to evidence of marital discord, which the court generally allows.

In *State v. Thompkins*, 271 Kan. 324, 335, 21 P.3d 997 (2001), this court stated:

"Evidence of the events at issue and other events contemporaneous with them between a defendant and a victim are admissible independent of K.S.A. 60-455 if the evidence is to establish the relationship between the parties. *State v. Taylor*, 234 Kan. 401, 407, 673 P.2d 1140 (1983). The rule in Kansas is that in a case of marital homicide, evidence of a discordant marital relationship and a wife's fear of her husband's temper is admissible to show the defendant's motive and intent. 234 Kan. at 408."

In *State v. Clark*, 261 Kan. 460, 470, 931 P.2d 664 (1997), Clark was charged with first-degree murder of his girlfriend. Clark objected to evidence concerning their relationship, and we stated:

"We have addressed the issue of relevance of evidence of a discordant relationship between a defendant and a victim in numerous cases and have held that admission of evidence of a discordant relationship is admissible independent of K.S.A. 60-455 and relevant to show the ongoing relationship between the parties, the existence of a continuing course of conduct, or to corroborate the testimony of witnesses as to the act charged. See *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991); *State v. Taylor*, 234 Kan. at 407; *State v. Green*, 232 Kan. 116, Syl ¶ 4, 652 P.2d 697 (1982)."

In the present case, Roberson's diary excerpts showed a discordant sexual relationship and the volatile emotions of the defendant. The lack of a marital bond between the murderer and the victim does not render the evidence inadmissible. Roberson's diary excerpts were powerful evidence of motive, intent, and the continuing, ongoing relationship between Roberson and Wilridge. The pornographic terms in which Roberson recorded his involvement with Wilridge are an integral part of the relationship between them.

Roberson also contends that K.S.A. 60-447(a) makes the evidence inadmissible. K.S.A. 60-447 governs the use of character traits as proof of conduct. Roberson contends that this statute is applicable because the diary excerpts were offered by the State to show that he is a purveyor of degrading pornography. In fact, the

diary excerpts showed motive and intent, which arose from the volatile sexual relationship between defendant and the victim. The evidence was admissible.

Parole status. The trial court's ruling on Roberson's motion in limine is reflected in a journal entry that states: "The state agrees that it will not mention any evidence which would allow the jury to have knowledge that the defendant had been previously convicted of a crime." During the State's questioning, a detective was asked to identify Exhibit 38. The detective responded: "It is a buck knife, and had various pieces of the handle, and it was recovered in his right front pocket from [sic] a parole officer at the time that he was arrested, and I was standing right there when he did, so." Defense counsel immediately asked to approach the bench and requested a mistrial. The prosecutor explained that the parole officer was working as a member of a felony apprehension unit so that the detective's reference to a parole officer was not necessarily a reference to Roberson's parole officer. At the request of defense counsel, the trial court judge admonished the prosecuting attorney to avoid mentioning "any words like parole or probation."

On appeal, Roberson rejects the prosecutor's explanation for the detective's mentioning a parole officer. The prosecutor's explanation seems plausible, the prosecutor's question does not seem to have been intended to draw a response about a parole officer, and no other inadvertent references to parole or probation have been reported to this court. We find no merit in Roberson's argument.

No abuse of discretion has been shown in the trial court's rulings on these evidentiary matters.

Roberson next argues on appeal that the trial court should not have instructed the jury that it should consider the lesser offenses of premeditated murder only if the jurors did not agree that he was guilty of the charged offense. Roberson concedes that no objection on this subject was raised at trial to the instructions. The appellate court, therefore, reviews the instructions for clear error.

In *State v. Trujillo*, 225 Kan. 320, 590 P.2d 1027 (1979), the reverse of Roberson's argument was made. In that case, the trial court instructed the jury on several lesser offenses of the charged offense, but there was no instruction on "which lesser offense was

the more serious." 225 Kan. at 324. The court stated that in the interests of promoting an orderly method of considering the possible verdicts, "a trial court should instruct on lesser included offenses in the order of severity beginning with the offense with the most severe penalty." 225 Kan. at 324. The court concluded that there could have been no prejudice from the free-form instructions because Trujillo was found guilty of the crime charged.

The pattern instructions offer an orderly method of considering possible verdicts. The pattern instructions offer a transitional statement that can be inserted at the beginning of the elements instructions of lesser offenses. For example, in this case the trial court used the pattern instruction transitional statement between the charged offense and the next less serious of the lesser offenses: "If you do not agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree-intentional." Then the trial court instructed on the elements of the lesser offense of second-degree intentional murder.

Roberson's complaint about the approved pattern method of considering possible verdicts is that the jury supposedly cannot consider the lesser offense until after rejecting conviction on the greater offense. In *State v. Korbel*, 231 Kan. 657, 661, 647 P.2d 1301 (1982), the court rejected a similar challenge to the words "if you cannot agree" when used to preface an instruction on a lesser charge. The court stated that the words

"are not coercive and do not require the members of a jury to unanimously find the accused innocent of the greater charge before proceeding to consider a lesser charge. The words 'if you cannot agree' presuppose less than a unanimous decision and no inference arises that an acquittal of the greater charge is required before considering the lesser." 231 Kan. at 661.

The jury is instructed that the charged offense, in this case first-degree murder, includes lesser offenses. Here the jury was instructed, according to PIK Crim. 3d 68.09, that the charged offense includes lesser offenses and that defendant may be found guilty of the charged offense, a lesser offense, or may be found not guilty. The court instructed the jury: "You may find the defendant guilty of murder in the first degree, murder in the second degree—in-

tentional, murder in the second degree—unintentional, voluntary manslaughter, involuntary manslaughter or not guilty." The trial court further instructed the jury that "[w]hen there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only." See K.S.A. 21-3109. Taking these instructions together with the elements instructions, the jury was fully and accurately informed that it could consider the lesser offenses, and the jury had an orderly method for doing so.

Roberson also complains about the prosecutor's comments on this subject in closing argument. The prosecutor told the jury:

"[Defense counsel] wants you to jump all the way down to voluntary manslaughter. Just disregard first and second degree manslaughter. Well, you can't get there before you look at first degree murder instruction.

"First you are to consider first degree murder and if you find that the State has proven all of those elements those three elements then you must find him guilty of first degree premeditated murder. Don't go any further. It very well may be that all of the other elements in every other charge have also been established someway throughout the evidence, but if you find that I have proven all of those elements. Those elements of premeditated first degree murder you don't even look beyond that. The rest of these instructions don't even get looked at. Voluntary manslaughter isn't even considered."

In *State v. Pabst*, 268 Kan. 501, Syl. ¶ 1, 996 P.2d 321 (2000), the court ruled: "To predicate reversible error on prosecutorial misconduct the error must be of such a magnitude as to deny a defendant's constitutional right to a fair trial." Instead of showing the court how the prosecutor's argument could have denied a fair trial, Roberson assumes the question by simply asserting that prosecutorial misconduct is contrary to a fair trial. The greater part of his argument focuses on the instructions, and he contends that the combined instructions and prosecutor's closing argument deprived him of a fair trial. The instructions, as already discussed, are consistent with a fair trial. The prosecutor's remarks go beyond the instructions in telling the jurors not to look at any elements instructions after the premeditated murder instruction, but Roberson has presented nothing from which the court would conclude that he was deprived of a fair trial on account of the closing argument.

Finally, Roberson argues that *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), was incorrectly decided and asks the court to overrule it and declare the hard 40 sentencing scheme unconstitutional. The basis of his argument is that the court improperly relied on *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), because the Pennsylvania statute at issue in *McMillan* and the Kansas hard 40 sentencing scheme are not comparable. Roberson's argument amounts to a motion for reconsideration of *Conley*. We deny his motion.

Affirmed.

DAVIS, J., not participating.

BRAZIL, Chief Judge, Retired, assigned.