No. 101,432

STATE OF KANSAS, *Appellee*, v. TAURUS ADAMS, *Appellant*.

(253 P.3d 5)

Opinion filed April 15, 2011.

*Meryl Carver-Allmond*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Robbin L. Wasson*, senior assistant district attorney, argued the cause, and *Jerome Gorman*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Taurus Adams was convicted by a jury of premeditated first-degree murder, in violation of K.S.A. 21-3401(a), and criminal use of a weapon, a class A misdemeanor, in violation of K.S.A. 21-4201. Adams now appeals from his conviction for premeditated first-degree murder, arguing (1) the prosecutor committed misconduct during closing argument, (2) the trial court erred by giving the jury instructions on premeditated first-degree murder and its lesser included offenses in descending order of severity, and (3) the trial court erred by instructing the jury regarding criminal intent and premeditation in a manner that impermissibly lessened the State's burden of proof. We reject Adams' arguments and affirm his conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On the night of December 23, 2007, a fight broke out near a bar

at The Legends in Kansas City, Kansas. Defendant Adams was at the scene with two friends, twin brothers Jeff and Jake Lichtenberger. The victim, Ratsamy Phanivong, was at the crowded bar to celebrate a friend's birthday.

Adams explained at trial that, on the day of the shooting, he was moving out of his residence into his parents' house and had loaded a few items into his car, including clothing, computer equipment, and his gun. Because the gun and ammunition were expensive, Adams did not want to leave them in the car, so he placed those items in his pockets.

That night, Adams, Jeff, and Jake went to a party. When they left the party, Adams was ready to go back to his parents' house, but the twins wanted to go to The Legends for a drink. They drove to The Legends, and Jeff and Jake went into the bar while Adams and another friend, Wes Murphy, stayed in the car.

Inside the bar, Jake made his way onto the dance floor. As Jake was dancing, a man confronted him about looking at his "girl" or dancing with her. The man asked if Jake and his brother wanted to go outside and fight. Then, Phanivong walked up and shoved Jake backwards a foot or two. Jake threw his beer in Phanivong's face. A group of Phanivong's friends walked up, but bouncers broke up the ruckus and told Phanivong to leave the bar. A short time later, the bouncers also told the twins to leave because of the drink-throwing incident. About that time, Adams, who had gotten cold in the car, came into the bar, asking for the car keys. The three friends left the bar together.

According to Jeff's trial testimony, as Adams and the twins turned to walk to the parking garage, Phanivong, who had not left the vicinity, saw them and asked Jeff, "Who threw that drink in my face?" Jeff did not want any trouble so he told Phanivong that "we didn't throw the drink." Adams and the twins were walking away when Phanivong took a swing at Jeff, hitting the back of his head. Jeff briefly fell to the ground and got back up. Adams jumped between Jeff and Phanivong and said they were not looking for trouble. With that, Phanivong punched Adams in the head. Adams pulled out a .40 caliber handgun from his waistband and fired two fatal shots at Phanivong. Adams and the twins ran to their car, while

Adams repeatedly said, "Let's go, let's go, let's go." They could not drive away, however, because security guards and bouncers detained them.

Another witness, Phanivong's friend Bounkhong Inhnarath who had left the bar with Phanivong, testified to a slightly different version of events. According to Inhnarath, while inside the bar, Phanivong argued with someone (apparently Jake) who threw a drink in Phanivong's face. A bouncer escorted the two friends out of the bar through a side door. It was a cold night, and Inhnarath used his cell phone to call another friend, who was still inside the bar and who had driven them to the bar. While waiting for their driver to exit the front door of the bar, Phanivong and Inhnarath encountered Adams, Jake, and Jeff exiting the bar. Inhnarath was waiting by the door, and Phanivong was waiting further back. After the three men passed by Inhnarath, Phanivong yelled to his friend that those were the guys who "started shit with me inside." Adams and the twins approached Phanivong and another altercation ensued, during which Inhnarath heard Adams say, "You want some of this?" From where he stood, Inhnarath did not see anybody throwing punches, although he admitted that he heard a "moving noise like almost like a thumping noise." Adams then pulled out a handgun and fired two shots at Phanivong, killing him. Inhnarath testified that when Adams pulled out the gun, Phanivong started slowly backing up.

Waleed Shabibi, a friend of Phanivong and Inhnarath, also testified. He explained that he and his girlfriend arrived outside at the bar as Inhnarath was calling the person who had driven him to the bar. According to Shabibi, Phanivong and Inhnarath were upset about the beer-throwing incident and being ejected from the bar. Shabibi testified that he was walking his girlfriend to the front entrance of the bar when he heard Phanivong and Inhnarath arguing with the other three men. Almost immediately after noticing the argument, Shabibi saw two muzzle flashes and heard shots.

Another witness, Stephanie Couch, was leaving the bar with some friends when she noticed a scuffle between two "groups"—two men who she initially thought were of Hispanic descent but later determined were of Asian descent against two Caucasian men

and an African-American man. Phanivong and Inhnarath are of Asian descent, Jake and Jeff are Caucasian, and Adams is African-American. Couch noticed yelling, arguing, and "some punches." She testified that she "heard screaming . . . about a girl." Couch saw one man of Asian descent and one Caucasian throw a punch. She thought the Caucasian's punch made contact, although no one fell to the ground. Couch testified that the African-American man drew his gun and shot.

Several other eyewitnesses testified. One saw a man of Asian descent punching someone in a group of three, then saw a man pull out his gun and heard him ask, "You sure you wanna do this?" The man then fired shots. A security guard was standing inside the front entrance of the bar before the shooting. He watched Adams and the twins as they walked from the bar and then saw Phanivong and Inhnarath approach them. He testified that he saw them arguing, and one of the men of Asian descent was "a little more excited than everyone else" because he was "moving his arms around." According to the security guard, no punches were exchanged, and he was preparing to call for help in breaking up the argument when two shots were fired.

Adams testified in his own defense. He told the jury, "I'm not guilty. I was just defending myself." Adams explained that as he left the bar with his two friends, he was in the lead. He noticed one man waiting outside the door, later identified as Inhnarath, and another man, later identified as Phanivong, further back. Phanivong walked up to Jeff and said, "Hey, man, you throw a drink on me?" After Jeff told him they did not want any trouble and that he did not throw a drink on him, Phanivong said, "Let's fight" and took a swing. Adams testified that Phanivong was angry—"real hot"—and "jumping around." Adams was walking away with the twins when Phanivong hit Jeff in the back of the head, and Jeff fell down. When Jeff stood up, Phanivong was still "coming at him," so Adams stepped between the two men to break up the scuffle.

According to Adams, he told Phanivong, "We don't want no problems, man. Hey, it's Christmas time. . . . I'm ready to go home. . . . We don't have to have no problems, man, let's just go home."

Phanivong said something like, "What's up?" And then Phanivong punched Adams in the temple.

Adams testified that at that point he looked over and saw the other man, Inhnarath, pull out a knife with a 5- or 6-inch blade. Adams said he pulled out his gun because he felt threatened and thought the gun would diffuse the situation.

Adams said he did not point the gun at anybody at first—he just pulled it out of his pocket, told the men to "back up," and pointed the gun at the ground "to make the gun visible." Adams started backing away and said something like, "We don't have to do this. You sure you want to do this?" Instead of retreating, Phanivong started for Adams' gun, and Inhnarath came at Adams with the knife. As Phanivong dove for the gun, he pushed Adams' arm. Then Adams lifted up the gun and fired a shot, aiming for Phanivong's shoulder. Adams testified: "It wasn't my intent to kill him. The whole . . . thing was . . . it was foolish, it was senseless, it was silly. But if somebody was gonna die over something foolish and silly, I didn't want it to be me." Adams shot Phanivong a second time because "he kept coming." After the second shot, Phanivong fell down.

Adams saw Inhnarath digging in Phanivong's pocket and feared that Inhnarath was trying to find a gun. Adams froze, and one of the twins grabbed his jacket and said, "Come on, let's go, let's go, let's go." The three friends then ran to the parking garage. They climbed into the car but did not leave because the car was surrounded by men who Adams thought were police officers. He opened the car door and threw down the gun because he "didn't want to get shot" by the police.

The bouncers and others came to the assistance of Phanivong. Kansas City, Kansas, police officers arrived on the scene shortly thereafter and took the occupants of the car into custody. None of the bouncers or police officers testified to finding a knife. Indeed, no other witnesses mentioned a knife, and Inhnarath denied having a weapon that night.

Adams was charged with the premeditated killing of Phanivong, in violation of K.S.A. 21-3401, and the criminal use of a weapon, in violation of K.S.A. 21-4201. He was convicted as charged. Adams

now makes a timely appeal over which this court has jurisdiction under K.S.A. 22-3601(b)(1) (conviction of an off-grid crime).

## PROSECUTORIAL MISCONDUCT

Adams first contends that the prosecutor committed misconduct during closing argument by making misstatements of law and attempting to inflame the jury, which denied Adams a fair trial. This contention lacks merit.

Adams complains about three specific statements made by the prosecutor. Defense counsel only objected to one of the prosecutor's statements (the third one), which was made during the rebuttal portion of the State's closing argument. Regardless, this court has recently reiterated that a contemporaneous objection to prosecutorial misconduct during closing argument is not required in order to preserve the issue for appeal. *State v. Stone*, 291 Kan. 13, 17, 237 P.3d 1229 (2010); *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009); *State v. McReynolds*, 288 Kan. 318, 322-23, 202 P.3d 658 (2009).

### *Standard of Review*

In reviewing claims of prosecutorial misconduct, this court utilizes a familiar two-step analysis:

"In general, appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury follows a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Albright*, 283 Kan. [418, 428, 153 P.3d 497 (2007)].

"In the second step of the two-step analysis, the appellate court considers three factors: '(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. [2010 Supp.] 60-261 [refusal to grant new trial is not erroneous if party's substantial rights were not affected] and *Chapman v. California*, 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824 [*reh. denied* 386 U.S. 987] (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial], have

been met. [Citations omitted.]' *State v. Albright*, 283 Kan. at 428." *State v. Mc-Reynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

See *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004) (second step essentially directed to whether misconduct was so prejudicial that it denied defendant a fair trial).

### First Statement

The first claim of misconduct alleged by Adams is the prosecutor's statement during rebuttal that "[t]his case doesn't just mean something to the defendant. It means something to Ratsamy Phanivong. This is the only chance he will ever have to have someone held accountable for taking his life. So this day is as much about him if not more than anyone else." Adams argues that this statement was improper for two reasons: (1) It was an improper appeal to base the jury's deliberations on sympathy for the victim, and (2) it was a misstatement of the law.

With regard to Adams' argument that the statement was an improper appeal for sympathy, a prosecutor crosses the line of appropriate argument when that argument is intended to inflame the jury's passions or prejudices or when the argument diverts the jury's attention from its duty to decide the case on the evidence and controlling law. *Tosh*, 278 Kan. at 90. Arguing the prosecutor crossed this line, Adams suggests that the comments in this case are similar to those in *State v. Henry*, 273 Kan. 608, 621, 44 P.3d 466 (2002). In *Henry*, the prosecutor urged the jury to think about Mother's Day and how the victim's mother felt. This court reversed and remanded for a new trial, in part, because the prosecutor's comment inflamed the passions of the jury and caused prejudice. In contrast, the statements in this case are not as inflammatory. Even so, the comments focus on sympathy for the victim.

Plus, this court has held that a prosecutor's argument regarding the impact of a crime on a victim or a victim's family may constitute reversible error because it diverts attention from the evidence and law. See *Tosh*, 278 Kan. at 92 (finding that the prosecutor's statements that the jury should convict the defendant in order to protect his daughter was one of the bases for reversible prosecutorial misconduct); *State v. Donesay*, 265 Kan. 60, 85-88, 959 P.2d 862

(1998) (murder victim's widow testified in detail regarding her relationship with her husband and her husband's friendly disposition; the admission of this testimony was irrelevant as to the crime charged and constituted reversible error).

The statement in this case more subtly focused on sympathy for the victim than did the statements at issue in *Henry*, *Tosh*, or *Donesay*. Nevertheless, in light of those cases, we conclude that the prosecutor's statement about the victim is improper. As in the prior cases, the prosecutor's argument diverts attention from the jury's function of determining guilt based on the instructions rather than because of sympathy.

Adams argues the error is compounded because the prosecutor's comments also misstate the law. Specifically, he argues the trial was not Phanivong's "only chance" to hold someone accountable for his death and, even if that was true, it is the prosecutor's responsibility, not the juror's, to bring criminal charges against an accused person. Adams asserts that "the jury could have been misled to believe that the only options were for it to convict [Adams] or allow the killing to go completely unpunished." The State responds that these were the only two options available to the jury because it is undisputed that Adams shot the gun, and, therefore, the only question is whether the shooting was in self-defense.

The State's position ignores several points which we consider valid and which lead us to the conclusion that the comments misstate the law. First, the comments ignore the possibility that the jury would not be able to unanimously agree on a verdict. Second, the comments ignore the availability of civil redress. Finally, the comments suggest that the case was brought on behalf of the victim rather than the people of Kansas.

Because the comments are both an improper appeal for sympathy for the victim and a misstatement of the law, we conclude the comments are improper. Consequently, we must consider whether the comments constitute plain error. The first factor in this determination is whether the conduct was gross and flagrant. In this regard, as we have noted, the call for sympathy in this case is much more subtle that in *Henry*, *Tosh*, and *Donesay*. Additionally, the prosecutor only made a passing reference to the victim

and did not dwell on or repeat the point. Hence we conclude the comments are not gross or flagrant.

The second factor to be considered in determining whether there is plain error is whether the comment showed ill will. Regarding this factor, Adams suggests that *Henry*, *Tosh*, and *Donesay* are not of recent origin and stand for well-established principles. On the other hand, in suggesting there was no ill will, the State points to the fact that the statements were made in the rebuttal portion of the prosecutor's argument, were responding to arguments made by defense counsel regarding the importance of the case to Adams, and were immediately preceded by the prosecutor urging the jury to "follow the law and decide this case based upon the evidence and the law as you're instructed. That was your oath. That's the right thing to do." As the State argues, we have repeatedly considered similar factors when assessing whether the prosecutor demonstrated ill will. See, *e.g.*, *State v. Martinez*, 290 Kan. 992, 1016, 236 P.3d 481 (2010); *State v. Murray*, 285 Kan. 503, 517, 174 P.3d 407 (2008). However, these cases should not be read to suggest that a prosecutor is given carte blanche authority to misstate the law as long as the misstatements are isolated to the rebuttal, are in response to defense arguments, or are accompanied by an admonition to follow the law and base the verdict on the evidence. We are especially reluctant to give these circumstances very much weight when the prosecutor's comments cross a well-established line that separates appropriate argument regarding the facts from an inappropriate invocation of sympathy.

The final factor in determining if a prosecutor's misconduct was plain error is whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. In this regard, we must consider that a misstatement of the law, whether by the prosecutor or by the court, denies the defendant a fair trial where the facts are such that the jury could have been confused or misled by the misstatement. *State v. Magallanez*, 290 Kan. 906, 915, 235 P.3d 460 (2010); *Henry*, 273 Kan. at 619.

We conclude the statements in this case do not rise to the level of depriving Adams of a fair trial. We are persuaded to this view-

point for several reasons. First, the reference to the victim was made in passing and was not repeated or emphasized. Second, the statement was not as egregious as those made in *Henry*, *Tosh*, or *Donesay*. Third, the misleading statement that the trial was the only chance the victim had of holding someone accountable is analogous to a line of cases where we concluded plain error had not occurred even though the court erroneously instructed the jury that "another trial would be a burden on both sides." PIK Crim. 3d 68.12 (2005 Supp.). (The current version of this pattern instruction removes the inappropriate language. See PIK Crim. 3d 68.12 [2009 Supp.]). Although the statement in the instruction differs from the prosecutor's argument, the implication is similar because both are misstatements that pressure the jury to reach a verdict. Yet, we held in *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009), that the misstatement in PIK Crim. 3d 68.12 (2005 Supp.), which came from the judge in the jury instructions and therefore presumably had more gravitas than an argument by counsel, did not require reversal. This court reasoned that the jury had been instructed on the matters that they were to consider and the elements that the State would have to prove beyond a reasonable doubt. Given that, the statements, while inappropriate, would not mislead the jury into ignoring their charge. Similarly, we do not see the prosecutor's misstatement as misleading the jury in light of the instructions, especially when the comment was made in the context of the prosecutor urging the jury to follow the instructions.

Finally, there was strong evidence before the jury to support the defendant's convictions. Although eyewitness accounts of the incident contained variations regarding punches thrown and the ethnicity of the persons arguing, there was no question that Adams killed Phanivong. The primary issues of fact argued to the jury were intent and self-defense. Regarding self-defense, although Adams testified a knife had been pulled and that led to his belief that he needed to respond with a deadly weapon, there was no corroborating eyewitness account or physical evidence to support this testimony, even though the circumstances were such that a jury could likely conclude that someone, especially Adams' friends, would have supported his testimony if it was true. Given that, there was

strong support for the State's theory that, even if Adams subjectively believed he needed to defend himself, this belief was objectively unreasonable, and hence Adams acted with excessive force.

On appeal, Adams' counsel focuses on the element of premeditation, arguing that the evidence of this element was weak. This argument ignores Adams' damning testimony where he described his actions, admitted to making the decision to shoot the gun, and explained that "if somebody was gonna die over something foolish and silly, I didn't want it to be me." This testimony presents evidence that Adams thought about and intended to kill before he fired the fatal shots, albeit as a result of what the jury concluded was an objectively unreasonable belief in the need for self-defense. In light of this strong evidence supporting the State's theory, we conclude the misconduct would likely have had little weight in the minds of the jurors when considering the issues of intent, premeditation, and self-defense.

### Second Statement

The second claim of misconduct alleged by Adams is the following statement made by the prosecutor during the main portion of the State's closing argument: "Do not, I implore you, sanction this behavior. You agree to the defendant's theory that this was self defense you are sanctioning his behavior." Adams argues that in making this statement, the prosecutor asked the jury to consider issues irrelevant to Adams' guilt or innocence. Instead, in an attempt to appeal to the juror's sense of community, the jury was asked to consider whether to generally condone this type of behavior.

Adams contends that this case is similar to *State v. Finley*, 268 Kan. 557, 998 P.3d 95 (2000) (*Finley I*), where the prosecutor stated the following during closing argument:

" 'You know, they say all the time that our police department enforces our laws in this country, that's not true. It's you guys. We have people in Topeka that make our laws, we have people in my office that prosecute them, but you all have the job of enforcing them. You all can find that he committed these crimes and hold him responsible for them. We cannot tolerate this kind of drug use in our community, especially when a person dies. You have to find him guilty. Thank you.' " *Finley I*, 268 Kan. at 571.

The *Finley I* court found the statement was reversible misconduct because the last remarks addressed to the jury—" 'We cannot tolerate this kind of drug use in our community, especially when a person dies. You have to find him guilty.' "—were grounds completely unrelated to the question the jury should have considered. Further, it was not clear whether the error had little, if any, likelihood of changing the result of the trial. *Finley I*, 268 Kan. at 572. The *Finley I* decision relied, in part, on *State v. Ruff*, 252 Kan. 625, 847 P.2d 1258 (1993), where the prosecutor committed reversible misconduct by urging the jury, " '[D]o not allow this conduct to be tolerated in our county.' " *Ruff*, 252 Kan. at 631. This court found the prosecutor's implication problematic—that if the jury found Ruff not guilty, her conduct would be tolerated.

In this case, however, in focusing on the statements imploring the jury not to sanction the behavior, Adams removes the passage from its context, and in context a different meaning is conveyed. The prosecutor stated:

"*Do not, I implore you, sanction this behavior. You agree to the defendant's theory that this was self defense, you are sanctioning his behavior* and the evidence does not support it. He's asking you to ignore people, ignore evidence, and most importantly, ignore the law because you do not bring a gun to a fist fight and you do not shoot someone who's only attacking physically even if that's true, and I'm not saying it is. There's some real dispute there." (Emphasis added.)

In context, the complained of statement is more akin to *State v. Finley*, 273 Kan. 237, 42 P.3d 723 (2002) (*Finley II*), relating to the retrial after Finley's first appeal resulted in a remand and new trial. In that second trial, the prosecutor asked the jury not to let the defendant " 'get away with' " his crime. This court found no misconduct stating:

"[T]he prosecutor's comment in this case was not an appeal to community interests in the sense that a not guilty verdict would have some sort of negative impact on the community. Rather, the prosecutor was arguing the defendant should not escape responsibility for this crime based on his highly implausible story . . . ." *Finley II*, 273 Kan. at 245.

See *State v. Cravatt*, 267 Kan. 314, 332, 979 P.2d 679 (1999) (finding no prosecutorial misconduct for telling jury, " 'Don't let a mur-

derer go free because of these half-baked theories the defense has presented to you.' ").

Like the situation in the *Finley II* case, the prosecutor in Adams' case was not making some type of appeal to community interests; rather, the prosecutor was arguing that the evidence did not support Adams' theory of self-defense. Adams' claim of prosecutorial misconduct fails.

*Third Statement*

The third claim of misconduct alleged by Adams is the following italicized statement made by the prosecutor during the rebuttal portion of the State's closing argument: "We agree on one thing. *This sure as heck would have been a different situation if the defendant had just walked away. He could have gone to the bouncers, he could have run to the parking garage.*" (Emphasis added.) Defense counsel objected to this statement and, out of the hearing of the jury, argued to the trial judge that the prosecutor misstated the law by implying that Adams had a duty to retreat. The prosecutor argued that she was merely responding to defense counsel's statement to the jury that the situation could have been reversed—that Adams could have been killed and the State could have been prosecuting someone for Adams' murder.

The judge allowed the prosecutor's rebuttal statement and noted that "[t]he jury has been instructed, I presume they're going to read the instructions that there is no duty to retreat." Nevertheless, neither the judge nor counsel specifically reminded the jury of that instruction.

The prosecutor did somewhat clarify her point, however, when her rebuttal continued:

"The defendant had a number of options starting with not bringing a gun. That's what led to [Phanivong's] murder, nothing else. The defendant had options. . . . The bully in this case was the man who wanted to settle a fight not with words, not even with some shoving, but with a gun. There's your bully."

In context, the complained of statement was consistent with the State's theory that Adams used excessive force rather than acted in justifiable self-defense. Additionally, it should be noted that the prosecutor never actually told the jury that Adams had a duty to

retreat, and the comments were ambiguous with regard to the point in time at which the prosecutor suggested Adams should have walked away. In other words, she could merely have been saying that Adams had a choice to walk away when angry words were exchanged and before he felt a need to defend himself, *i.e.*, before the point in time when the right to defend himself arose.

Nevertheless, although not clearly or strongly conveying the meaning Adams seeks to impute, arguably the prosecutor's statement implied a duty to retreat, and such an implication was contrary to the judge's instruction to the jury. See K.S.A. 2010 Supp. 21-3218(a); PIK Crim. 3d 54.17 (use of force in defense of a person); PIK Crim. 3d 54.17-A (no duty to retreat). We think this implication is a reasonable one to draw because the district judge, during the bench conference, discussed the duty to retreat—apparently because he felt the implication had been made. Hence, we conclude the comments that were made before the bench conference were improper.

We note that the weak implication left by the ambiguous comments could have been erased if the judge or prosecutor had reminded the jury of the instruction that explained there was no duty to retreat or if the judge had sustained the objection. Instead, an arguably weak suggestion was strengthened when the court overruled the objection.

That being said, as we consider the second prong of our analysis of whether those comments are plain error, we conclude the statement did not deny Adams a fair trial. As indicated, the statements were ambiguous and not of a gross or flagrant nature. In addition, the statement was minimized by the prosecutor's follow-up comment explaining the State's theory that excessive force was used by Adams. These comments suggest to us that the earlier statements were not motivated by ill will. Moreover, as discussed above, the trial court properly gave the self-defense jury instruction which clearly stated there was no requirement to retreat. See *State v. Bunyard*, 281 Kan. 392, 406, 133 P.3d 14 (2006) ("[A] prosecutor's misstatement of the law must be considered in the context of the jury instructions given by the court."). Further, although Adams' testimony contained some support for his theory of self-defense,

there was strong evidence supporting a criminal conviction. As a result, we conclude that the comments likely had little weight in the minds of the jurors, and we find the error was harmless.

Additionally, we do not find plain error when we consider the cumulative effect of the two comments that we have found to be improper. As we have noted, neither point was dwelled on nor was one misstatement associated with the other. The statements do not become more egregious when considered together. Finally, the comments, even when considered together, would have little weight in the minds of the jurors. The cumulative impact of the two statements was harmless under either K.S.A. 2010 Supp. 60-261 or *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967).

### ORDER OF HOMICIDE JURY INSTRUCTIONS

Next, Adams complains for the first time on appeal about the order in which certain jury instructions were given. Specifically, he argues that the trial court erred by instructing the jury on premeditated first-degree murder and its lesser included offenses in descending order of severity. Adams contends that instructing the jury in this manner infringed on his constitutional right to the presumption of innocence. This contention lacks merit.

*Standard of Review*

Because Adams did not raise this objection to the jury instructions at trial, this court reviews this issue under the clearly erroneous standard. See K.S.A. 22-3414(3); *Magallanez*, 290 Kan. at 918; *State v. Vasquez*, 287 Kan. 40, Syl. ¶ 6, 194 P.3d 563 (2008). "Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred." *Vasquez*, 287 Kan. 40, Syl. ¶ 6; see *State v. Ellmaker*, 289 Kan. 1132, 1139-40, 221 P.3d 1105 (2009); *Salts*, 288 Kan. at 265-66.

The jury was instructed on the elements of premeditated first-degree murder, then intentional second-degree murder, then voluntary manslaughter, and then involuntary manslaughter. After the premeditated first-degree murder instruction was given, and be-

fore the lesser offense elements instructions were given, the trial court gave the following jury instruction, Instruction 7, consistent with PIK Crim. 3d 68.09:

"The offense of murder in the first degree with which the defendant is charged includes the lesser offenses of murder in the second degree, voluntary manslaughter, and involuntary manslaughter.

"You may find the defendant guilty of murder in the first degree, or murder in the second degree or voluntary manslaughter or involuntary manslaughter or not guilty.

"When there is a reasonable doubt as to which of one or more offense the defendant is guilty, he may be convicted of the lesser offense only.

"Your Presiding Juror should sign the appropriate verdict form. The other verdict forms are to be left unsigned."

The trial court also used a transitional statement between the charged offense and the next less serious of the lesser offenses. For example, the jury was instructed that "[i]f you do not agree that the defendant is guilty of Murder in the First Degree as charged in Count I, you should then consider the lesser included offense of Murder in the Second Degree." Then the trial court instructed on the elements of the lesser offense of intentional second-degree murder. Similar transitional language was used to instruct the jury that if it did not agree that Adams was guilty of second-degree murder, it should consider voluntary manslaughter. If it did not agree that he was guilty of voluntary manslaughter, it should consider involuntary manslaughter.

According to Adams, these instructions told the jury to convict him of premeditated first-degree murder without considering the lesser included offenses or that the jurors should only consider the lesser offenses if they acquitted him of premeditated first-degree murder. Adams argues that this is contrary to K.S.A. 21-3109, which states that a defendant is innocent until proven guilty, and that "[w]hen there is a reasonable doubt as to which of two or more degrees of an offense he is guilty, he may be convicted of the lowest degree only." In Adams' view, this statute requires juries to consider the charged crime and the lesser included offenses *together* or in *ascending order* of severity.

It is important to note, however, that instruction No. 7, quoted above, is nearly identical to K.S.A. 21-3109. Further, Adams' argument is inconsistent with our decisions in *State v. Lawrence*, 281 Kan. 1081, 1091, 135 P.3d 1211 (2006); *State v. Roberson*, 272 Kan. 1143, 1153-55, 38 P.3d 715 (2002), *disapproved on other grounds State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006); and *State v. Trujillo*, 225 Kan. 320, 590 P.2d 1027 (1979).

In *Trujillo*, the earliest of these decisions, the reverse of Adams' argument was made. In other words, Trujillo argued that the jury need to be instructed regarding "which lesser offense was the more serious." *Trujillo*, 225 Kan. at 324. This court stated that in the interests of promoting an orderly method of considering the possible verdicts, "a trial court should instruct on lesser included offenses in the order of severity beginning with the offense with the most severe penalty." *Trujillo*, 225 Kan. at 324. Nevertheless, this court concluded that there could have been no prejudice from the free-form instructions because Trujillo was found guilty of the crime charged. *Trujillo*, 225 Kan. at 324.

Likewise, in *Lawrence*, 281 Kan. 1081, this court restated our approval of the PIK method of ordering the jury's deliberation on lesser included offenses, stating: " 'The pattern instructions offer an orderly method of considering possible verdicts. The pattern instructions offer a transitional statement that can be inserted at the beginning of the elements instructions of lesser offenses.' [Citation omitted.]" *Lawrence*, 281 Kan. at 1091.

In *Roberson*, 272 Kan. 1143, the defendant raised a similar argument to the one raised in the present case. The defendant argued that an instruction stating " '[i]f you do not agree that the defendant is guilty' " was erroneous because it required the jury to reject a conviction on the greater charge before considering lesser included offenses. *Roberson*, 272 Kan. at 1154. This court rejected that claim because there was nothing in the instruction requiring a unanimous decision on the greater charge before considering the lesser charges. We also read all the instructions together, which indicated that the "jury was fully and accurately informed that it could consider the lesser offenses." *Roberson*, 272 Kan. at 1155; see *State v. Carter*, 284 Kan. 312, Syl. ¶ 14, 160 P.3d 457 (2007) ("Instructions

that direct jurors to move on to consideration of lesser included offenses only if they do not agree or if they do not find defendant guilty are not coercive and correctly state the law."); *State v. Korbel*, 231 Kan. 657, 661, 647 P.2d 1301 (1982) (rejecting defendant's argument that the words " 'if you cannot agree' " in jury instruction coerced the jury into returning a verdict of guilty on the more severe charge).

Here, the jury was instructed, in accordance with PIK Crim. 3d 68.09, that the charged offense included lesser offenses and that Adams could be found guilty of the charged offense, a lesser offense, or could be found not guilty. Taking these instructions together with the elements instructions, the jury was fully and accurately informed that it could consider the lesser offenses, and the jury had an orderly method for doing so. Neither the jury instructions nor their order of presentation are clearly erroneous.

### Defining Criminal Intent and Premeditation

For Adams' final argument, he contends that three jury instructions on criminal intent and premeditation impermissibly lessened the State's burden to prove premeditated first-degree murder. This contention also lacks merit.

*Standard of Review*

As in the previous issue, Adams did not object to these jury instructions at trial. Therefore, this court reviews this issue under the clearly erroneous standard as well. See K.S.A. 22-3414(3); *State v. Magallanez*, 290 Kan. 906, 918, 235 P.3d 460 (2010); *Ellmaker*, 289 Kan. at 1139-40.

Adams complains about instruction Nos. 6, 11, and 17, which provided the following guidance to jurors:

"Instruction No. 6

"The defendant is charged in Count I with the crime of Murder in the First Degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:
1.  That the defendant killed Ratsamy Phanivong;
2.  That such killing was done with premeditation; and
3.  That this act occurred on or about the 23rd day of December, 2007, in Wyandotte County, Kansas.

"Premeditation means to have thought over the matter beforehand, in order to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

### "Instruction No. 11

"As used in these instructions the word 'intentionally' means conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing,' 'willful,' 'purposeful' and 'on purpose.'

"As used in these instructions the word 'willfully' means conduct that is purposeful and intentional and not accidental.

"As used in these instructions the words 'heat of passion' means any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection."

### "Instruction No. 17

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

Adams argues that instruction Nos. 6 and 11, viewed together, correctly required the jury to find that he intended to kill Phanivong willfully, purposefully, and not accidentally, but instruction No. 17 "[told] the jury to infer that Mr. Adams intended to kill Mr. Phanivong simply because he committed an act that led to his death." In other words, the jury could have been led to believe that only the voluntary act of shooting had to be thought over beforehand, not the killing. Therefore, Adams concludes that instruction No. 17 created an inference that "destroyed" the State's burden to prove beyond a reasonable doubt that Adams intended to kill Phanivong.

We disagree because the instructions clearly advised that the intent to kill and premeditation were separate elements and that the State was required to prove both. Moreover, Adams' arguments have been consistently rejected by this court. See, e.g., *Ellmaker*, 289 Kan. 1132, Syl. ¶ 4 ("An instruction containing a permissive inference does not relieve the State of its burden because the State is still required to convince the jury that an element, such as intent,

should be inferred based on the proven facts."); *State v. Stone*, 253 Kan. 105, 107, 853 P.2d 662 (1993) (instruction creates permissible inference rather than improper rebuttable presumption; therefore does not violate due process rights); *State v. Harkness*, 252 Kan. 510, 525-27, 847 P.2d 1191(1993) (instruction allowing jury to draw inference that defendant intended all consequences of his voluntary acts and that any such inference was required to be considered along with other evidence did not unconstitutionally shift burden of proof on intent to defendant); see also *State v. Hernandez*, 44 Kan. App. 2d 524, Syl. ¶ 4, 239 P.3d 103 (2010) ("Under the facts of this case, the instructions of intent and premeditation as a whole did not impermissibly lessen the State's burden to prove attempted first-degree murder.").

To prove first-degree murder, the State must prove that the defendant killed the victim intentionally and with premeditation. K.S.A. 21-3401(a); see *State v. Trussell*, 289 Kan. 499, 503, 213 P.3d 1052 (2009) (State required to prove specific intent to kill and premeditation to convict of first-degree murder). The legislature has defined "intentional" as "purposeful and willful and not accidental." K.S.A. 21-3201(b). Under element 1 of instruction No. 6, the jury was required to find that Adams intentionally killed Phanivong. Element 2 stated the premeditation requirement and clearly required that the *killing* be premeditated. Thus, contrary to Adams' argument, the instruction left no room for the jury to conclude that only the act of shooting had to be premeditated.

Further, the definition of premeditation in instruction No. 6, which is identical to the definition in PIK Crim. 3d 56.04(b), reiterated that the *killing* had to be premeditated and that "the concept of premeditation requires more than the instantaneous, intentional act of *taking another's life*." (Emphasis added.)

In addition, instruction No. 5, which Adams does not discuss and which corresponds to PIK Crim. 3d 52.02, clearly informed the jury of the State's burden to prove every element. Instruction No. 17 did not alter the other instructions' guidance on the State's burden of proof. As explained in the PIK Committee's Notes on Use for PIK Crim. 3d 54.01 (on which instruction No. 17 is based), the inference of intent instruction "is a rule of evidence and does

not deal with the required element of criminal intent necessary for conviction in those cases where criminal intent is a necessary element of the offense"; see also PIK Crim. 3d 54.01-A, Notes on Use ("This instruction must not be confused with PIK Crim. 3d 54.01 . . . which is a rule of evidence and does not purport to charge the jury to find criminal intent necessary for conviction."); *State v. Lassley*, 218 Kan. 752, 756, 545 P.2d 379 (1976) (stating that the inference of intent instruction pertains to the presumption of intent which is merely a rule of evidence). Moreover, the "instruction is designed to make it crystal clear that the 'presumption' is only a permissive inference, leaving the trier of fact free to consider or reject it." PIK Crim. 3d 54.01, Comment. In fact, instruction No. 17 emphasized: "You may accept or reject [the inference] in determining whether the State has met its burden to prove the required criminal intent of the defendant."

In concert with the other instructions given regarding the State's burden, there can be no real danger that a jury would be misled as to what the State was required to prove. As given, the instructions referenced above properly and fairly stated the law. The criminal intent and premeditation jury instructions were not clearly erroneous, and PIK Crim. 3d 54.01, which states that ordinarily a person intends all of the usual consequences of his voluntary acts, did not mislead the jury into believing that the State did not have to prove the defendant premeditated the killing. PIK Crim. 3d 54.01 contains a permissive inference that may be considered by jurors along with all the other evidence in the case and does not replace the required element of criminal intent necessary for conviction in those cases where criminal intent is a necessary element of the offense. Other instructions clearly informed the jury of the State's burden to prove every element, including proving premeditation and an intent to kill.

Affirmed.

RICHARD M. SMITH, District Judge, assigned.

*  *  *

BEIER, J., dissenting: I respectfully dissent from my colleagues' disposition of this case, because I believe the prosecutorial misconduct that all of us agree existed was unavoidably reversible error.

The only truly contested issue for the jury on the murder charge in this case was whether defendant Taurus Adams acted in justifiable self-defense during a bar fight or with premeditation and intent to kill Ratsamy Phanivong. In my view, conflicting evidence on the behavior of Adams and Phanivong made this issue far from open and shut.

Under such circumstances, the prosecutor's repeated misstatements of the law and encouragement of purely emotional responses from members of the jury undermine my confidence in the verdict. Even if the prosecutor's missteps were not gross and flagrant or motivated by ill will—and I think the clarity of precedent on their inappropriateness means that they were—the harmless error test of *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), cannot be met.

I would therefore reverse and remand for new fair trial.

JOHNSON, J., joins in the foregoing dissent.