IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,643

STATE OF KANSAS,
*Appellee*,

v.

ALONZO UNION,
*Appellant*.


SYLLABUS BY THE COURT


A no contest plea to a charged offense operates to establish every essential well-pleaded element of that offense. When one of those essential elements requires the taking of resources having a certain value, the well-pleaded facts in the charging document necessary to support this "value" element may be considered as evidence to support restitution.


Review of the judgment of the Court of Appeals in an unpublished opinion filed October 21, 2022. Appeal from Wyandotte District Court; AARON T. ROBERTS, judge. Oral argument held February 1, 2024. Opinion filed August 9, 2024. Judgment of the Court of Appeals affirming the district court is affirmed in part and vacated in part. Judgment of the district court is affirmed in part and vacated in part.


*Randall L. Hodgkinson,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.


*Ivan Moya*, assistant district attorney, argued the cause, and *Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.


1

The opinion of the court was delivered by

WILSON, J.:  This case challenges a restitution order.

Alonzo Union was the caretaker of Jean Miller, an elderly woman with dementia. For several years, at one time serving as Miller's power of attorney, Union had access to Miller's finances. When a nursing home bill went unpaid, the Kansas Department for Children and Families (DCF) investigated Union's activities. Union entered a no contest plea to mistreatment of a dependent adult. As part of his sentence, the court ordered Union to pay the nursing home Miller's outstanding balance as part of his restitution, and also ordered Union to pay restitution to Miller for certain payments and cash withdrawals from Miller's account, including one-half of the Walmart purchases and one-half of the ATM withdrawals.

Union appealed and a panel affirmed the restitution amount. We granted review on one issue:  whether the restitution order was supported by substantial competent evidence. Within this issue, Union argues the nursing home restitution award was not causally linked to his crime of conviction, and he also argues the evidence did not support the Walmart and ATM withdrawal restitution figures. We vacate the nursing home restitution award and affirm the rest.

FACTS AND PROCEDURAL BACKGROUND

Alonzo Union met Jean Miller in 2007. They soon became friends, and within a few years, Union moved in with Miller and they shared the rent. After Miller began to suffer from dementia, Union acted as her caretaker. By 2014, Union was authorized to use Miller's bank account.

2

Union became Miller's durable power of attorney in March 2016. That summer, Miller moved into Riverbend, a nursing home. Miller left Riverbend in March 2017, with an outstanding account balance of around $9,000. Union set up a payment schedule, but the payments stopped after two or three months. Miller moved back in with Union after leaving Riverbend.

At this point, Riverbend notified DCF that there was potential abuse or neglect. Katrina Racklyeft, a social worker for DCF, opened an investigation. She interviewed both Union and Miller. She also reviewed Miller's finances and became concerned elder abuse was occurring. Her office requested and received an emergency guardianship and conservatorship to protect Miller and her finances.

Racklyeft went with a member of the sheriff's office to serve Union and remove Miller from the home. Union was not there but they found Miller. The front door was screwed shut and the backdoor was blocked by a lawnmower. Miller appeared to be in good health. A member of the sheriff's office left the guardianship papers in the home. Racklyeft returned the next day and spoke with Union. She explained he was required to turn over Miller's accounts and cards. Yet Union continued to access Miller's funds.

*District Court Proceedings*

In November 2018, Union agreed to plead no contest to mistreatment of a dependent adult, a level 5, person felony. In turn, the State agreed to be open to probation and would argue restitution. After advising Union of his right to a trial and asking questions about the plea agreement, the court accepted the no contest plea and found Union guilty. At the sentencing hearing, the court imposed a 43-month underlying sentence and suspended the sentence in favor of probation. Miller passed away before sentencing.

3

At the March 2019 restitution hearing, Racklyeft testified about her investigation of Miller's finances from November 2014 to November 2017. First, all the income in Miller's account, totaling $52,787.54, was traced to Miller and consisted solely of her social security and a pension. Second, Racklyeft testified to the expenses during that period she believed contributed to Miller's care. These expenses included utilities.

Third, Racklyeft testified to the expenses she believed did not contribute to Miller's care. These expenses were broken into many categories, with the two largest being ATM withdrawals, which came to a "ballpark figure" of $30,000, and Walmart purchases, which totaled $9,365.28. Other expenses included liquor, the YMCA, USPS, several purchases in Minnesota, a dating website, a casino, Men's Wearhouse, and a shoe store. Racklyeft presented three spreadsheets as demonstrative evidence in support of her testimony.

Racklyeft testified she could not account for the $30,000 of ATM withdrawals because "[t]here's no way to show receipts of where that money was spent." She explained she did not know what the withdrawals were used for. When asked what the withdrawals revealed, based on her training and experience, she responded: "I can't answer that. I don't know that it went to her care. I can't say that it did, but I can't say that it didn't because there's no trail with it like with the other purchases." She explained she had to presume the money was not spent for Miller. She asked Union about the withdrawals during their initial interview, and Union said he spent the money on the house they were renting and the items in the home. Union never provided receipts for rent, though Racklyeft never requested this information. Racklyeft also noted she did not know what Union purchased at Walmart.

4

Racklyeft asserted Union owed Riverbend $7,632.74 for Miller's stay because, at the time, he was Miller's durable power of attorney and he signed the paperwork admitting Miller to the facility. Separately, Union had personally guaranteed the Riverbend bill.

In summary, Racklyeft asserted damages incurred by Miller consisted of Miller's entire income figure, $52,787.54, plus the Riverbend bill, $7,632.74, leading to a grand total loss of $60,420.28.

Union also testified at the restitution hearing and provided his account of the expenditures. He acknowledged that some expenditures were not for Miller, including the liquor purchases and the shoe purchase. But he testified all the ATM withdrawals were for "[t]he house, us, food." He explained some of the Walmart purchases were money orders or cash used to pay for Miller's car, including "some large amounts" around $1,000, which were required to catch up on payments that her previous caretaker, her brother, failed to make. Union drove the vehicle to Minnesota several times and used Miller's money to pay gas and to register the vehicle in Minnesota.

He explained that before Miller moved into Riverbend, they split rent down the middle. After Miller left Riverbend and they moved into a new residence, they paid $750 in rent, which came from the account he was authorized to use. He also used this account to pay utilities, insurance, and other household requirements. Miller and Union rented both residences from the same company. Union testified that he tried to contact the rental company to get proof of payments, but he failed because the company's phone was not set up and the company's business location had moved.

Union testified his income came from a VA pension and social security. He did not put the VA pension in the account he was authorized to use. Though the testimony is

5

unclear, it appears he began drawing social security after Miller was removed from the home.

Union also testified about the outstanding bill at Riverbend. He acknowledged he owed Riverbend $7,632.74 for Miller's stay. He explained he stopped making payments because he reached out to Riverbend and Racklyeft to discuss Riverbend adding an extra $900 to the bill that he did not understand.

Union also acknowledged that, as a durable power of attorney, he had a duty to record how he used Miller's money. He testified he kept records of what was spent on himself and what he spent on Miller, but he explained these records were lost except for receipts related to furniture purchases.

The final witness at the restitution hearing was Miller's niece, Crystal Cartwright. She visited Miller when Miller was living with Union. Cartwright felt Miller was well cared for and never worried about Miller's financial or emotional stability.

After the witness testimony, the court heard arguments and then took the issue under advisement. The court issued its restitution order in June 2019. The court ordered Union to pay $31,511.26 in restitution. It reached this figure by adding up these amounts:

- $7,632.74 - Riverbend
- $15,244.89 - one-half of the total ATM withdrawals
- $531.67 - liquor store purchases
- $3,115.59 - out of state purchases
- $119.70 - dating website
- $184.03 - Men's Wearhouse
- $4,682.64 - one-half of the total Walmart purchases

6

The $7,632.74 was to be paid to Riverbend, and the remaining $23,878.52 was to be paid to Miller. The court observed Union provided no documentation to support his claim that the ATM withdrawals and Walmart purchases were for Miller's benefit. It explained:

> "The Court finds that based upon the admitted dishonesty of this crime and the failure of Mr. Union to keep a proper account of the expenditures from Ms. Miller's account, there is clear and convincing circumstantial evidence that Defendant spent a significant portion of Ms. Miller's money on himself, with no concurrent benefit to her. The Court finds it is likely he used cash as a way to conceal this improper spending. Accordingly, the Court attributes a generously low 50% of the unaccounted-for expenditures to the benefit of the Defendant."

Union filed a notice of appeal.

*Appellate Proceedings*

On appeal, Union made three arguments. *State v. Union*, No. 121,643, 2022 WL 12127306, at *1 (Kan. App. 2022) (unpublished opinion). First, he argued sufficient evidence did not support the district court's restitution order. Second, he argued the Kansas criminal restitution statutes violate section 5 of the Kansas Constitution Bill of Rights. Third, he argued the Kansas criminal restitution statutes violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The panel rejected the first and third arguments. It vacated the order that the restitution award was a civil judgment. The panel affirmed the balance of Union's restitution order. *Union*, 2022 WL 12127306, at *5-6.

7

Union petitioned for review with this court, and we granted review only on the sufficiency argument. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review.).

DISCUSSION

Union asserts much of the district court's restitution order must be vacated by this court for two reasons: (1) the amount owed to Riverbend was not caused by the crime of conviction, and (2) insufficient evidence supports the district court's restitution awards of half the Walmart purchases and half the ATM withdrawals.

*Standard of Review*

Appellate review of restitution orders may require three standards of review. *State v. Shank*, 304 Kan. 89, 93, 369 P.3d 322 (2016). First, "[q]uestions concerning the 'amount of restitution and the manner in which it is made to the aggrieved party' are reviewed under an abuse of discretion standard." 304 Kan. at 93 (quoting *State v. King*, 288 Kan. 333, 354-55, 204 P.3d 585 [2009]). "A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact." *State v. Hillard*, 315 Kan. 732, 760, 511 P.3d 883 (2022).

Second, "'[a] district court's factual findings relating to the causal link between the crime committed and the victim's loss will be affirmed if those findings are supported by substantial competent evidence.'" *Shank*, 304 Kan. at 93. "'Substantial competent evidence is 'such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.'" *State v. Smith*, 312 Kan. 876, 887, 482 P.3d

8

586 (2021). "'In evaluating the evidence to support the district court's factual findings, an appellate court does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact.'" *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 481, 509 P.3d 1211 (2022).

Third, "'appellate courts have unlimited review over legal questions involving the interpretation of the underlying statutes.'" *Shank*, 304 Kan. at 93.

*Analysis*

K.S.A. 21-6604(b)(1) provides a sentencing court may "order the defendant to pay restitution, which shall include, but not be limited to, damage or loss caused by the defendant's crime." K.S.A. 21-6607(c)(2) "gives the district court the authority to order restitution payments as a condition of probation." *State v. Arnett*, 314 Kan. 183, 186, 496 P.3d 928 (2021) *(Arnett II)*. "And the most accurate measure of this loss depends on the evidence before the district court." *State v. Hall*, 297 Kan. 709, 713-14, 304 P.3d 677 (2013). "'Although the rigidness and proof of value that lies in a civil damage suit does not apply in a criminal case, the court's determination of restitution must be based on reliable evidence which yields a defensible restitution figure.'" *State v. Hunziker*, 274 Kan. 655, 660, 56 P.3d 202 (2002) (quoting *State v. Casto*, 22 Kan. App. 2d 152, 154, 912 P.2d 772 [1996]).

*Riverbend*

In *State v. Arnett*, we explained "the causal link between a defendant's crime and the restitution damages for which the defendant is held liable must satisfy the traditional elements of proximate cause: cause-in-fact and legal causation." *State v. Arnett*, 307 Kan. 648, 655, 413 P.3d 787 (2018) *(Arnett I)*.

Cause-in-fact "requires proof that it is more likely than not that, but for the defendant's conduct, the result would not have occurred." *Arnett I*, 307 Kan. at 654. The other element, legal cause, "limits the defendant's liability even when his or her conduct was the cause-in-fact of a result by requiring that the defendant is only liable when it was foreseeable that the defendant's conduct might have created a risk of harm and the result of that conduct and any contributing causes were foreseeable." 307 Kan. at 655. As noted above, we review a causation finding for substantial competent evidence. *Shank*, 304 Kan. at 93.

Union makes two specific arguments related to the Riverbend restitution order. First, he contends failing to pay Riverbend did not harm *Miller*. He essentially asserts his restitution order cannot be based on damage to someone other than the victim of his crime. The panel rejected this argument based on the language of K.S.A. 21-6604(b)(1). *Union*, 2022 WL 12127306, at *4. But we need not decide whether restitution may be based on damage to someone other than the victim of his crime because Union prevails on his second argument.

Union's second argument related to Riverbend is that *Riverbend* was not damaged by Union's conduct in committing the crime for which he was convicted. To evaluate this, it is necessary to understand Union's crime of conviction. He pled no contest to one count of mistreatment of a dependent adult, in violation of K.S.A. 21-5417(a)(2)(A). The statute criminalizes taking the property or financial resources of a dependent adult for the use of the defendant or another through "[u]ndue influence, coercion, harassment, duress, deception, false representation, false pretense or without adequate consideration to such dependent adult." See *State v. Mayfield*, No. 121,552, 2021 WL 935715, at *2 (Kan. App. 2021) (unpublished opinion) ("Without parsing the statutory language too finely, we recognize the Legislature intended K.S.A. 2014 Supp. 21-5417[a][2][A] to criminalize a

10

wide range of ways to divert or take the financial resources of a dependent adult, such as the 'use' of those resources.").

Even assuming, without deciding, that restitution might be owed to someone other than a victim of the crime of conviction, assessment of restitution for the nursing home arrearage would only be appropriate if Union's crime of conviction was the proximate cause of the nursing home's damage or loss. See *State v. Martin,* 308 Kan. 1343, 1352, 429 P.3d 896 (2018) ("At the restitution hearing, the district court must first determine which of the claimed damages were caused by Martin's crimes of conviction."). For proximate cause to exist, Union's specific crime must have been the but-for cause of Riverbend's damage. See *State v. Miller*, 51 Kan. App. 2d 869, 874, 355 P.3d 716 (2015) ("But our statutes do not provide for restitution orders beyond those caused by the crime of conviction without the defendant's agreement.").

After a searching review of the record, we conclude no evidence shows Union's crime of conviction caused the Riverbend bill or caused this bill to go unpaid. The Riverbend bill was caused by Miller's independent need for care. And the State presented no evidence that Union's use of Miller's financial resources led to the outstanding debt. Union's crime and the unpaid bill are two independent and unrelated events. Put differently, Union's misuse of Miller's money was not necessary for the bill's existence. The outstanding bill did not result from Union's crime.

Unlike here, causation in other cases has been found when the crime of conviction caused cascading effects. See, e.g., *Arnett I*, 307 Kan. at 652-56 (finding property loss from thefts, damage to a home caused by the burglary, and a homeowner's out of pocket expenses were causally related to the crime of conspiracy to commit burglary, even though the defendant did not personally commit the burglary but loaned the burglars her mother's vehicle to commit the crime); *State v. Wills*, No. 122,493, 2021 WL 5143798, at

11

*2-5 (Kan. App. 2021) (unpublished opinion) (finding victims' lost wages for part-time jobs, costs associated with hypnosis and therapy appointments, and expended sick and vacation leave were causally related to the crimes of aggravated sexual battery and aggravated domestic battery); *State v. Boyd*, No. 118,925, 2019 WL 2312875, at *11-12 (Kan. App. 2019) (unpublished opinion) (finding restitution order for a lost Pell Grant was permissible because the lost grant was caused by psychological effects of the sexual assault crimes of conviction).

The district court's restitution order provided no analysis of causation and the Riverbend restitution award. That said, the panel concluded the following pieces of evidence supported the causation finding: "Union's admission that he was responsible for the bill, Racklyeft's testimony that Union was supposed to pay the bill as Miller's power of attorney, and the undisputed evidence on the amount of the bill." *Union*, 2022 WL 12127306, at *4. But this evidence only suggests Union was responsible for paying the bill. It does not suggest Union's *crime* caused the bill to accrue or caused the bill to go unpaid.

Accordingly, we find insufficient proof of causation because there is not substantial competent evidence supporting the State's position that Union's crime was the cause-in-fact of Riverbend's unpaid bill. We thus need not consider legal cause. We vacate the portion of the restitution order directing Union to pay Riverbend $7,632.74.

*Walmart Purchases and ATM Withdrawals*

Union next asserts the district court erroneously ordered him to pay one-half of all Walmart purchases and one-half of all ATM withdrawals. The crux of his argument is that the court's order is "speculative," and Union suggests the burden of proof was erroneously shifted, causing him to prove the *proper* use of the funds. He asserts the only

evidence the district court could have relied upon was from Racklyeft, who testified she did not know what Union purchased at Walmart and did not know how he used the money withdrawn from the ATMs. While the district court may have found that Union's uncorroborated assertions of appropriate purchases lacked credibility, Union asserts the burden is the State's to prove wrongdoing, not his to prove the purchases were for Miller's benefit.

The panel found this argument unpersuasive. It asserted "there was ample circumstantial evidence to support the district court's finding that the funds were not for Miller's benefit." *Union*, 2022 WL 12127306, at *4. We agree the evidence from the restitution hearing supports the district court's findings that Union misused at least some of Miller's funds. For example, Union testified that he made many liquor purchases even though Union did not drink and conceded that he improperly used her money to buy shoes. And Union testified that while Miller was in Riverbend receiving care for all her needs, he took Miller's car to Minnesota, used her money for gas, and used her money to register the vehicle in Minnesota, all with no ascertainable benefit to anyone other than himself.

Further, Union's testimony supported the district court's finding that he failed to properly account for his expenditures. The court considered Union's testimony that he tried to find the rental company to verify rent payments, but the company had apparently changed buildings and disconnected its phone line. And the court heard Union explain that he had kept records of how he and Miller split costs but had lost those records. After hearing this testimony, the district court concluded "there is clear and convincing circumstantial evidence that [Union] spent a significant portion of Ms. Miller's money on himself" and that it was "likely he used cash as a way to conceal this improper spending."

13

But we also agree with Union that the State bears the burden of identifying the restitution award amount with specificity. See *State v. Smith*, 317 Kan. 130,138-40, 526 P.3d 1047 (2023) (observing the district court likely erroneously imposed a $4,100 restitution award when the evidence only supported a $3,200 restitution award). Union is correct the evidence at the restitution hearing, including Racklyeft's testimony, did not identify *how* the ATM withdrawals were spent or *what* was purchased at Walmart, so there is no evidence in the record at the restitution hearing that specifically supports the district court's assessment of one-half rather than, say, one-third or two-thirds of the purchases and withdrawals.

Accordingly, we cannot affirm the district court and panel on this evidence alone. But we conclude the portion of the restitution order owed to Miller is supported by substantial competent evidence when considering Union's no contest plea, the well-pleaded facts of the charging document, and the district court's finding of guilt.

Union entered a plea of no contest to the statutory version of mistreatment of a dependent adult. This crime contains an element requiring proof beyond a reasonable doubt that the accused misappropriated at least $25,000, but no more than $100,000, from the victim to make the crime of conviction a level 5, person felony. Accordingly, Union did not contest the element of the crime of conviction *that he unlawfully took between $25,000 and $100,000 from Miller*.

A no contest plea "is 'a plea by which a defendant does not expressly admit his guilt, but nonetheless waives his right to a trial and authorizes the court for purposes of the case to treat him as if he were guilty.'" *State v. Case*, 289 Kan. 457, 461, 213 P.3d 429 (2009) (quoting Roberts, *The Mythical Divide Between Collateral and Direct Consequences of Criminal Convictions,* 93 Minn. L. Rev. 670, 729-30 [2008]); see also

14

K.S.A. 22-3209(2) ("A plea of nolo contendere is a formal declaration that the defendant does not contest the charge.").

A sentencing court may consider the elements of a charged crime as met following a no contest plea. See *State v. Holmes*, 222 Kan. 212, 214, 563 P.2d 480 (1977) ("Under [K.S.A. 22-3209(2)] when a court accepts a tendered plea of nolo contendere and adjudges a finding of guilt thereon, the defendant at that point has been convicted of the offense covered by the plea of nolo contendere."). Notably, K.S.A. 22-3209(2) prevents a defendant's no contest plea from being used against them "as an admission in *any other action based on the same act.*" (Emphasis added.) Union's no contest plea could not, for example, be used against him in a later civil action based on the same acts in the charging document. 21 Am. Jur. 2d Criminal Law § 645 ("A plea of nolo contendere is used by the accused in criminal cases to save face and avoid exacting an admission that could be used as an admission in other potential or subsequent litigation, whether civil or criminal.").

But by making a no contest plea "the offender admits *to all of the well-pleaded facts of the information* for purposes of the case." (Emphasis added.) *Farris v. McKune*, 259 Kan. 181, 194, 911 P.2d 177 (1996); *State v. Gibson*, No. 125,769, 2024 WL 3219339, at *5 (Kan. App. 2024) (unpublished opinion). Restitution is part of a criminal sentence, which is part of the criminal case. See *State v. Johnson*, 309 Kan. 992, 996, 441 P.3d 1036 (2019) ("Restitution is part of a sentence."); *Mitchell v. United States*, 526 U.S. 314, 328, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999) (noting "[a] sentencing hearing is part of the criminal case"). And here, the First Amended Information includes the well-pleaded allegation concerning the element of the crime of mistreatment of a dependent adult addressing the value of what Union took from Miller—"at least $25,000 but less than $100,000" of Miller's personal property or financial resources. Because of Union's no contest plea, this essential element, well-pleaded in the charge, may be considered when evaluating the sufficiency of the evidence of the restitution award.

15

We therefore conclude Union misused between $25,000 and $100,000 of Miller's funds based on his no contest plea and the court's subsequent finding of guilt. The no contest plea and the elements of the crime of conviction provide substantial competent evidence that, minimally, Union caused $25,000 in damage or loss to Miller. See *Spotts v. State*, No. 107,909, 2013 WL 2991294, at *3 (Kan. App. 2013) (unpublished opinion) (explaining a "no contest plea prevents [a defendant] from contesting the factual assertions alleged in the amended complaint").

So there is reliable evidence supporting the restitution award. Though Union argues the district court did not have reliable evidence to support *how* the court calculated the award, this argument is obviated by Union's no contest plea, which established the element requiring the value of the property taken to be at least $25,000. Not including the Riverbend award, the district court ordered Union to pay $23,878.52, slightly less than the lower limit of his crime of conviction. We therefore affirm the restitution award owed to Miller.

The Riverbend restitution order is vacated. The rest of the restitution order is affirmed.

Judgment of the Court of Appeals affirming the district court is affirmed in part and vacated in part. Judgment of the district court is affirmed in part and vacated in part.