NOT DESIGNATED FOR PUBLICATION

No. 125,214

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

ANGELIC B. MYERS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; JOSEPH L. MCCARVILLE III, judge. Submitted without oral argument. Opinion filed November 27, 2024. Affirmed in part, vacated in part, and remanded with directions.

*Grace E. Tran*, of Kansas Appellate Defender Office, for appellant.

*Kimberly A. Rodebaugh*, senior assistant district attorney, *Thomas R. Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., GARDNER, J., and CARL FOLSOM III, District Judge, assigned.

PER CURIAM: After a jury found Angelic B. Myers guilty of 1 count of felony theft and 14 counts of forgery, the district court imposed a term of 16 months in prison and ordered her to pay $14,305.07 in restitution. Myers now appeals, alleging that the prosecutor erred and that the district court erred in her sentencing and restitution orders. As detailed below, we agree with some but not all of Myers' contentions.

*Factual and Procedural Background*

Myers served as an office manager at Power Solutions for about five years. Her responsibilities included managing financial transactions, processing invoices, assigning job charges, handling invoicing and new hire paperwork, and ensuring safety items were addressed. In March 2020, she was fired after being accused of stealing money and using company checks for personal expenses.

Myers was charged with 1 count of felony theft and 14 counts of forgery stemming from her unauthorized use of the company's funds and credit cards for personal expenses over an extended period. In April 2021, a jury found Myers guilty of 1 severity level 9 count of felony theft and 14 severity level 8 counts of felony forgery.

About a year later, finding that Myers had a criminal history classification of I, the district court imposed a prison term of 16 months then suspended that for 24 months' probation. The district court ordered Myers to pay $14,305.07 in restitution and imposed 60 days of county jail time as a condition of probation.

Myers appeals.

*Did the Prosecutor Misstate the Law Regarding Reasonable Doubt or Err by Presenting Evidence Based on Alleged Sympathy?*

Myers first argues that the prosecutor erred during voir dire and closing arguments, prejudicing her right to a fair trial.

Appellate courts review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a

timely objection, but the court considers the absence of an objection when analyzing the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

*Standard of Review*

We use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). We first evaluate if the prosecutor's actions exceed "the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Then, if an error is identified, we determine whether it prejudiced the defendant's due process rights to a fair trial. This evaluation follows the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), meaning the prosecutorial error is harmless if the State proves "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citations omitted.]" *Sherman*, 305 Kan. at 109.

The State contends that the prosecutor's statements were within the allowed scope for presenting the State's case and were not erroneous. The State alternatively argues that if an error occurred, it is harmless.

*First step: the prosecutor did not exceed the wide latitude afforded prosecutors.*

Myers argues that during voir dire and closing arguments, the prosecutor's use of a "blank slate" metaphor undermined the burden of proof required for the State. Additionally, she contends that the prosecutor referencing the case's lengthy duration and

the Thompsons' charitable contributions aimed to elicit jury sympathy, which constituted errors that prejudiced her right to a fair trial.

*The prosecutor did not misstate the law when discussing the burden of proof.*

A prosecutor commits error by misstating the law. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021). A misstatement of controlling law must be reviewed on appeal, regardless of a timely objection at trial, to protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006); see also *State v. Magallanez*, 290 Kan. 906, 915, 235 P.3d 460 (2010) (misrepresentation of burden of proof in closing argument).

Myers contends that the "blank slate" metaphor the prosecutor used during voir dire and closing argument "diluted" the prosecution's burden of proof beyond a reasonable doubt, prejudicing Myers' right to a fair trial. Myers points to this statement the prosecutor made during voir dire:

> "It's the State's responsibility as I said a couple times is to prove guilt beyond all reasonable doubt. Some people call it presumption of innocence. Basically when someone walks into the courtroom they're a blank slate. They have the presumption of innocence. It's the responsibility for the State to write on that slate and you will be instructed of certain elements of a crime, and at the conclusion of the trial you look and if those elements aren't written on the slate, then you have to find not guilty."

And Myers notes this statement during closing argument:

> "So when you start looking at the elements of the offense, the state welcomes the burden of proof. The defendant doesn't have to prove that she is not guilty. But, remember, she

4

walked in here a blank slate and when the evidence has been presented there has been writing on the slate and the state would contend that the elements of the offense now changes the blank slate."

But the Kansas Supreme Court has instructed that we must evaluate a prosecutor's comments in context and that such statements can be mitigated by jury instructions regarding the burden of proof. *Watson*, 313 Kan. at 177. As the State points out, Myers omits the full context of the prosecutor's statements, which clarifies the legal principles of presumption of innocence and burden of proof.

During voir dire, the prosecutor discussed the process of jury selection in a criminal trial, focusing on key concepts including the presumption of innocence and the burden of proof. The prosecutor used the "blank slate" metaphor to emphasize that Myers is presumed innocent until proven guilty and that the State has the responsibility to prove guilt beyond a reasonable doubt throughout voir dire.

"We will talk about other concepts throughout this trial and a general concept is just because someone is charged with a crime, doesn't mean they did it. So anyone accused of a crime as they walk in here is presumed innocent, unless and until the State proves beyond a reasonable doubt. So who here has heard of—raise your hand if you've heard of the presumption of innocence. People are begrudgingly raising their hands. Raise your hand if you've heard of the presumption of innocence.

. . . .

"Innocent until proven guilty is the presumption of innocence. Raise your hand if you heard that? I'm scanning that making sure. Anyone accused of a crime, they don't have to prove anything. It's the State's responsibility as I said a couple times is to prove guilt beyond all reasonable doubt. Some people call it presumption of innocence. Basically when someone walks into the courtroom they're a blank slate. They have the presumption of innocence. It's the responsibility for the State to write on that slate and you will be instructed of certain elements of a crime, and at the conclusion of the trial you look and if those elements aren't written on the slate, then you have to find not guilty."

5

The Kansas Supreme Court cautioned against prosecutors' use of metaphors in *Sherman*, because figurative language may mislead a jury about the burden of proof. 305 Kan. at 115-18. Yet here, the prosecutor's use of a "blank slate" metaphor to symbolize presumed innocence and suggest that the State must write the case's elements on it underscores the principle that a defendant starts with a presumption of innocence.

The prosecutor's "blank slate" metaphor resembles the puzzle analogy discussed in *Sherman*. Traditionally, the puzzle metaphor implies that the prosecution's role is like piecing together a puzzle—each piece of evidence contributes to a comprehensive picture of the defendant's guilt. Courts have found this analogy erroneous because it may mislead jurors by suggesting that the burden of proof is merely about collecting enough pieces rather than establishing guilt beyond a reasonable doubt. *Sherman*, 305 Kan. at 115-18. In contrast to the puzzle analogy, the prosecutor's "blank slate" metaphor here emphasizes the principle of presumed innocence, indicating that the State must prove its case from the ground up, akin to crafting a new narrative. "So some people refer to it as a cloak of innocence or presumption of innocence. Everyone that walks in has a blank slate and the elements have to be written on that slate. If you find we haven't written the elements, then you have to find not guilty."

Although this metaphor does not inherently misrepresent the burden of proof, it may tend to oversimplify the prosecution's burden to prove all elements beyond a reasonable doubt. But here, the prosecutor tested jurors' understanding of and agreement with the applicable legal principles:

> "For a criminal case it's a higher burden of proof; that being proof beyond a reasonable doubt. Who's heard that concept proof beyond a reasonable doubt? Okay. I see you're all raising your hands. So there's no magic definition of proof beyond a reasonable doubt. It is proof beyond a reasonable doubt, not proof beyond any doubt, or proof beyond all doubt. So it's a higher standard. Does anyone here think that the State would have to prove something absolutely in order for you to be comfortable finding the defendant

6

guilty? I see no hands. Raise your hand if you would promise to hold the State to the standard of proof beyond a reasonable doubt. All right. I see all hands. . . . We welcome that burden, and we're proud to be in a system where someone doesn't have to prove their innocence and that it's our responsibility to prove the case beyond a reasonable doubt."

The prosecutor reminded jurors toward the end of voir dire that sympathy should not influence their decision-making and used the "blank slate" metaphor to illustrate that they must adhere to the controlling legal standards:

"And one thing. I will tell you is one of the instructions will be you're not to let sympathy influence you and what happens in this case is the defendant, if the defendant is found guilty, that's not up to you. The judge decides that. Your responsibility is to listen to the evidence and make a determination as to whether the State has met its burden of proof of the elements on the blank slate beyond a reasonable doubt. Who agrees to hold the State to that burden of proof? Okay. And is there anyone that will say, well, you know, I think I'll add an element the State has to prove? I see no hands. Anyone say, well, you know, if the State, if they prove two out of three, that's good enough for me? I see a lot of head shaking in the negative way. If the State did not meet its burden of proof on the elements, raise your hand if you would find the defendant not guilty. I see all hands. On the other hand at the end of the trial if the elements were proven, written on a slate beyond a reasonable doubt, who here would be able to find Angie Myers guilty? Raise your hand. I saw hands."

These statements, taken in context, did not shift the burden of proof or misstate the law during voir dire. They fall within the wide latitude afforded prosecutors to craft their arguments and discuss evidence.

The prosecutor's closing statements similarly conveyed the burden of proof, emphasizing that the State must prove the defendant's guilt beyond a reasonable doubt:

"[E]arly last week when you were being questioned we talked about the burden of proof and we talked about what you would look at in assessing credibility of a witness, how

7

you would assess motive why someone may be candid or not, what motive someone may have to tell a certain story and I want you to keep all of those things in mind as you go through the evidence and as you deliberate and as you analyze whether or not the state has met its burden of proof beyond a reasonable doubt."

The district court's jury instructions clarified the presumption of innocence. And the prosecutor in her closing argument reviewed the burden of proof instruction with the jury.

"A huge thing that will be important will be the instructions that you're given and you promised that not only will you hold the state to the burden of proof beyond a reasonable doubt but that you wouldn't deviate from the instructions and I asked you to follow the instructions because where there may be a motion one way or another and you may not have liked certain things that you heard, the sole issue here is the allegation that Angie Myers stole between $1,500.00 and $25,000.00. . . . [I]f you find yourself back in the deliberation room and someone wants to add an element and say well, maybe she felt this, or this would be an additional thing, you always keep on track because you're sworn to look at simply the elements and analyze whether or not the state has met its burden of proof beyond a reasonable doubt."

Later in her argument, the prosecutor reviewed the instructions listing specific elements that the State must prove beyond a reasonable doubt.

Viewed in its entirety, the prosecutor's statements, bolstered by the jury instructions, not only reinforced the presumption of innocence but also underscored the burden of proof. The prosecutor thus did not impermissibly shift the burden of proof.

*The prosecutor did not err by presenting arguments based on sympathy.*

Myers claims that the prosecutor inappropriately influenced the jury by appealing to its sympathy rather than focusing on the evidence.

8

"With sincerity I want to apologize for the length of time that it's taken. This is an important case for the defendant. This is an important case for the State of Kansas, and the reality is last week when we started the case there was no idea that we would be here a week later. This case is important to the defendant. The case is important to the State of Kansas. Specifically, it's important to Patrick and Ashley Thompson because they have waited for this case to be presented for well over two years. I'd ask you if you have been frustrated in any way with the length of time or what I thought needed to be for thoroughness to present evidence that you don't hold that against Patrick and Ashley Thompson. This is the one time that the case is being presented, and the state recognizes the burden that I have in proving the case and the elements beyond a reasonable doubt, and so even though it was tedious and there may have been frustration, I apologize for that and I do sincerely thank you for the attention that you've given on this case."

The State counters that the prosecutor did not appeal the jury's sympathy towards the Thompsons but asked the jury not hold any frustration against any party, including Myers, due to the length of the trial.

A prosecutor has considerable discretion to formulate arguments that incorporate reasonable inferences drawn from the evidence. *State v. Barber*, 302 Kan. 367, 379, 353 P.3d 1108 (2015). But a prosecutor errs when arguing a fact or factual inference without an evidentiary foundation. *Watson*, 313 Kan. at 179. Even so, the prosecutor's claims here were backed by evidence. Although expected to last a few days, the trial was extended into a second week. The prosecutor acknowledged the lengthy trial and any frustrations the jury may have experienced, noting the State had admitted 108 pages of text messages between the defendant and Patrick, most of which had been read aloud. Even Myers' attorney described that email review as "tedious." Still, the prosecutor's recognition of the burden placed on the jury and her mention of the two years that the Thompsons waited bore no relationship to the factors the jury had to decide.

9

Myers also challenges the prosecutor's emphasis on the Thompsons' societal contributions. She claims that such comments had nothing to do with evidence, were irrelevant to Myers' guilt, and distracted the jurors from their responsibility to base their verdict solely on the evidence.

> "I will remind you, this is not a trial where you are determining if Angie Myers is a bad person. What you are determining—or Beau Myers for that matter. You heard evidence that the Myers have done great things, that Ms. Myers worked for Disability Supports, that Mr. Myers worked as a law enforcement officer and even after this trial is concluded that doesn't take away any positive contributions they've given to society. I would remind you the same is true. We're not here to determine the Thompson's contributions to society. You may have heard evidence that there was salty language used at Power Solutions and in your opinion, and it's shared by many people, there probably shouldn't be that type of language in an office. You may have seen language that was used by the defendant and, again, that's not what we're here to determine. Patrick and Ashley Thompson have made tremendous amount of contributions and regardless of the jury verdict they will have those contributions that they have made to charitable contributions et cetera."

True, a prosecutor must avoid making inflammatory statements that could sway the jurors' emotions or distract them from focusing on the evidence in the case. *State v. Adams*, 292 Kan. 60, 67, 253 P.3d 5 (2011). Yet a prosecutor is allowed wide latitude when formulating arguments that incorporate reasonable inferences drawn from the evidence. *Barber*, 302 Kan. at 379. In the closing arguments of *Barber*, the prosecutor's comments focused on the defendant's self-perception as a victim, which the Kansas Supreme Court critiqued as misconduct for potentially inflaming jury biases. While the prosecutor referenced some evidence to support this claim, the court found it distracted the jurors from their primary duty of assessing guilt based solely on the evidence presented. 302 Kan. at 379-381. In contrast, the prosecutor's statements about Myers, her husband, and the Thompsons aimed to underscore their positive societal contributions. This emphasis is a reasonable inference based on trial evidence, illustrating that the

10

defendant misappropriated funds while falsely presenting them as charitable contributions.

Because the prosecutor's challenged comments were within the wide latitude afforded, we find no error and we need not reach the second step of our analysis.

*Did the District Court Err by Imposing 24 Months of Probation?*

Myers next argues that the district court ordered her to serve an illegal sentence—24 months of probation instead of 18 months.

Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which the appellate court has unlimited review. *State v. Mitchell*, 315 Kan. 156, 158, 505 P.3d 739 (2022). A defendant may challenge a sentence as illegal even for the first time on appeal. *State v. Hambright*, 310 Kan. 408, 411, 447 P.3d 972 (2019).

An illegal sentence is a sentence that:  (1) is imposed by a court without jurisdiction; (2) does not conform to the applicable statutory provisions, either in character or the term of punishment; or (3) is ambiguous about the time and manner in which it is to be served. K.S.A. 22-3504(c)(1); see *Mitchell*, 315 Kan. at 158. Myers invokes the second provision here.

*The sentencing court erred in Myers' sentence.*

Myers argues that the sentencing court ordered her to serve 24 months of probation but that the presumptive length of her probation is 18 months. The State agrees that the district court erred because Myers' sentence does not conform to the applicable statutory provision in K.S.A. 21-6804(i) and the district court did not make any statutory findings for a departure.

11

The defendant's primary conviction was forgery, a severity level 8 nondrug nonperson felony, but she was convicted of 14 counts of forgery and 1 count of theft, a nondrug nonperson level 9 felony. The district court imposed a prison term of 16 months then suspended that for 24 months' probation. For each count of forgery, the standard range was 8 months, with up to 18 months of presumptive probation. The single count of theft standard range was 6 months, with presumptive probation of up to 12 months. See K.S.A. 21-6804(i); K.S.A. 21-6608(c)(3), (4).

Myers and the State are correct that under K.S.A. 21-6608(c)(4), Myers' primary crime is her level 8 felony, which sets her base sentence as a presumptive probation of up to 18 months. And the district court made no special findings under K.S.A. 21-6608 that would permit a longer term. Thus Myers' sentence of 24 months' probation is illegal because it does not conform to the relevant statute. We thus vacate in part and remand to the sentencing court to correct Myers' sentence in accordance with this opinion.

*Did the District Court Err by Ordering Restitution Without a Nexus for the Crimes of Conviction?*

Myers next contends that the district court erred in ordering restitution because it failed to establish the direct nexus required by statute between her crimes of conviction and the expenses billed by the accounting firm that reviewed Power Solutions' records.

Myers contends that most of the charges do not relate to her illegal acts for which restitution was ordered. But the State maintains that the district court's decision is justified, asserting that evidence demonstrates Myers' unauthorized purchases were unrelated to legitimate business operations, thereby requiring the audit by the accounting firm.

12

Appellate courts affirm the district court's factual findings underlying the causal link between the crime and the victim's loss if substantial competent evidence supports these findings. *State v. Union*, 319 Kan. 214, 553 P.3d 320 (2024).

Under K.S.A. 21-6604(b)(1), a sentencing court may "order the defendant to pay restitution, which shall include, but not be limited to, damage or loss caused by the defendant's crime." K.S.A. 21-6607(c)(2) "gives the district court the authority to order restitution payments as a condition of probation." *State v. Arnett*, 314 Kan. 183, 186, 496 P.3d 928 (2021) *(Arnett II)*. "And the most accurate measure of this loss depends on the evidence before the district court." *State v. Hall*, 297 Kan. 709, 714, 304 P.3d 677 (2013).

"[T]he causal link between a defendant's crime and the restitution damages for which the defendant is held liable must satisfy the traditional elements of proximate cause: cause-in-fact and legal causation." *State v. Arnett*, 307 Kan. 648, 655, 413 P.3d 787 (2018) (*Arnett I*). Cause-in-fact "requires proof that it is more likely than not that, but for the defendant's conduct, the result would not have occurred." 307 Kan. at 654. The other element, legal cause, requires that the defendant is liable only when "it was foreseeable that the defendant's conduct might have created a risk of harm and the result of that conduct and any contributing causes were foreseeable." 307 Kan. at 655.

> "[C]ausation in other cases has been found when the crime of conviction caused cascading effects. See, e.g., *Arnett I*, 307 Kan. at 652-56, 413 P.3d 787 (finding property loss from thefts, damage to a home caused by the burglary, and a homeowner's out of pocket expenses were causally related to the crime of conspiracy to commit burglary, even though the defendant did not personally commit the burglary but loaned the burglars her mother's vehicle to commit the crime); *State v. Wills*, No. 122,493, 2021 WL 5143798, at *2-5 (Kan. App. 2021) (unpublished opinion) (finding victims' lost wages for part-time jobs, costs associated with hypnosis and therapy appointments, and expended sick and vacation leave were causally related to the crimes of aggravated sexual battery and aggravated domestic battery); *State v. Boyd*, No. 118,925, 2019 WL 2312875, at *11-

13

12 (Kan. App. 2019) (unpublished opinion) (finding restitution order for a lost Pell Grant was permissible because the lost grant was caused by psychological effects of the sexual assault crimes of conviction)." *Union*, 319 Kan. at 222.

The district court carefully analyzed the trial evidence, including receipts and testimonies, to fairly assess restitution related to Power Solutions' business expenses.

The district court examined the validity of the documents and considered the defendant's admissions and witness statements, explaining:

"Okay, so I'm going to set restitution in the amount of $14,305.07. That's my arithmetic. With respect to the theft charges I'm satisfied that the jury found that all of those were attributed to her, all of those that show on the exhibit there for credit cards. We're not including in that the previous amount owed on the heater because that was a loan, probably an imprudent loan but it was a loan."

Myers complains that the accountants' "clean up" work was not caused by her thefts or forgery. But the district court also analyzed whether Myers had caused all the damages Power Solutions sought, and it found a causal link or nexus between Myers' crimes and the accounting bill:

"[W]ith respect to the bill from Adams, Beran and Ball, that was money that had to be spent because of the crimes of the defendant. It is true they had to kind of clean up the books to figure out where the thefts were so that, they had to do that and I don't think that's inappropriate to assess that as part of restitution so the restitution is set at $14,305.07."

Substantial competent evidence supports that determination. Thompson testified that he contacted an accountant to do a QuickBooks review because he was concerned that Myers may be embezzling from his business. The accountant testified that she reviewed the QuickBooks account, she gave Thompson work reports on various accounts

14

within that software, and she charged him for the audit or review. That firm's email reflected costs of $1,251 for "cleaning up" the QuickBooks files.

The evidence sufficiently ties Myers' conduct to the financial losses charged by the accounting firm and suffered by the claimant, justifying the restitution amount. And it is more likely than not that, but for Myers' crimes of conviction, Power Solutions would not have needed an accounting firm to review its accounts. Similarly, it was foreseeable that Myers' illegal conduct might have created this risk of harm and the result of her conduct and any contributing causes were foreseeable. We thus find no error in the district court's decision to require Myers to pay restitution for the full amount charged by the accountants.

*Did the District Court Abuse Its Discretion by Ordering Myers to Pay the Full Amount for the Janitorial Supply Expenses?*

Lastly, Myers claims that adjustments made during trial show that most of the amount charged by Janitorial Supply ($215.65) should be attributed to Power Solutions, making her restitution for more than that unjustified. The State counters that the court's decision to require full restitution for the janitorial bill was justified based on evidence that the defendant misused a credit card for unauthorized purchases unrelated to business. The State alleged that Myers had made unauthorized purchases for her personal use from Janitorial Supply, which supplied Power Solutions with cleaning supplies and then billed the company on an invoice.

We review the amount of restitution for an abuse of discretion. *State v. Martin*, 308 Kan. 1343, 1349-50, 429 P.3d 896 (2018). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). "'Although the rigidness and proof of value that lies in a civil damage suit does

not apply in a criminal case, the court's determination of restitution must be based on reliable evidence which yields a defensible restitution figure.'" *State v. Hunziker*, 274 Kan. 655, 663, 56 P.3d 202 (2002).

The district court specifically addressed Myers' argument related to the janitorial receipt, ordering full restitution of $215.65 for an invoice from Janitorial Supply, confirming that the theft charges were attributed to the defendant. Patrick testified that the defendant had made the purchases, which included items typically unnecessary for a business with concrete floors. And she failed to follow proper procedures for documenting business purchases—Myers submitted no paperwork to prove the expenses were for Power Solutions.

Still, Myers contends that the district court made an error of fact, as only $39.64 was attributable to her personal expenses and that the rest was purchased for Power Solutions. We agree. The record confirms that during trial, the Thompsons attributed only $39.64 of the Janitorial Supply invoice to products that Myers purchased for her own use. The Thompsons had initially included the full amount invoiced from Janitorial Supply as part of the money they alleged Myers had stolen. But Patrick later agreed that the amount of $215.65 was incorrect and that the total amount he claimed Myers owed from the Janitorial Supply invoice was $39.64. Counsel then modified their respective exhibits to reflect that amount of loss as $39.64 instead of $215.65. Apparently, the rest of the supplies on that invoice had been purchased for Power Solutions use.

But that updated amount did not carry over to sentencing. At sentencing, the State referenced the victim impact statement when discussing restitution. Attached to that statement was a table showing that the Thompsons were seeking $215.65 from the Janitorial Supply invoice. So the district court included that outdated amount in its restitution order, even though only $39.64 was supported by evidence at trial. By

16

including more than $39.64 in restitution for the Janitorial Supply invoice, the district court made a factual error.

We thus vacate in part and remand for resentencing to correct Myers' term of probation and to reduce the amount of her restitution in accordance with this opinion.

Affirmed in part, vacated in part, and remanded with directions.